# UNIVERSITY OF PENNSYLVANIA *v.* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

No. 88–493.   Argued November 7, 1989—Decided January 9, 1990

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Rex E. Lee* argued the cause for petitioner. With him on the briefs were *Steven B. Feirson, Carter G. Phillips, Mark D. Hopson, Nancy J. Bregstein, Shelley Z. Green,* and *Neil J. Hamburg.*

*Solicitor General Starr* argued the cause for respondent. With him on the briefs were *Acting Solicitor General Bryson, Deputy Solicitors General Wallace* and *Merrill, Stephen L. Nightingale, Charles A. Shanor, Gwendolyn Young Reams, Lorraine C. Davis,* and *Harry F. Tepker, Jr.**

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we are asked to decide whether a university enjoys a special privilege, grounded in either the common law or the First Amendment, against disclosure of peer review materials that are relevant to charges of racial or sexual discrimination in tenure decisions.

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of University Professors by *William W. Van Alstyne, Ann H. Franke,* and *Martha A. Toll;* for the President and Fellows of Harvard College by *Allan A. Ryan, Jr.,* and *Daniel Steiner;* for Stanford University et al. by *Steven L. Mayer, Iris Brest, Susan K. Hoerger,* and *Thomas H. Wright, Jr.;* and for the American Council on Education by *Sheldon Elliot Steinbach.*

*Susan Deller Ross, R. Bruce Keiner, Jr.,* and *Sarah E. Burns* filed a brief for the NOW Legal Defense and Education Fund et al. as *amici curiae* urging affirmance.

I

The University of Pennsylvania, petitioner here, is a private institution. It currently operates 12 schools, including the Wharton School of Business, which collectively enroll approximately 18,000 full-time students.

In 1985, the University denied tenure to Rosalie Tung, an associate professor on the Wharton faculty. Tung then filed a sworn charge of discrimination with respondent Equal Employment Opportunity Commission (EEOC or Commission). App. 23. As subsequently amended, the charge alleged that Tung was the victim of discrimination on the basis of race, sex, and national origin, in violation of § 703(a) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U. S. C. § 2000e–2(a) (1982 ed.), which makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

In her charge, Tung stated that the department chairman had sexually harassed her and that, in her belief, after she insisted that their relationship remain professional, he had submitted a negative letter to the University's Personnel Committee which possessed ultimate responsibility for tenure decisions. She also alleged that her qualifications were "equal to or better than" those of five named male faculty members who had received more favorable treatment. Tung noted that the majority of the members of her department had recommended her for tenure, and stated that she had been given no reason for the decision against her, but had discovered of her own efforts that the Personnel Committee had attempted to justify its decision "on the ground that the Wharton School is not interested in China-related research." App. 29. This explanation, Tung's charge alleged, was a pretext for discrimination: "simply their way of saying they do not want a Chinese-American, Oriental, woman in their school." *Ibid.*

The Commission undertook an investigation into Tung's charge and requested a variety of relevant information from petitioner. When the University refused to provide certain of that information, the Commission's Acting District Director issued a subpoena seeking, among other things, Tung's tenure-review file and the tenure files of the five male faculty members identified in the charge. *Id.*, at 21. Petitioner refused to produce a number of the tenure-file documents. It applied to the Commission for modification of the subpoena to exclude what it termed "confidential peer review information," specifically, (1) confidential letters written by Tung's evaluators; (2) the department chairman's letter of evaluation; (3) documents reflecting the internal deliberations of faculty committees considering applications for tenure, including the Department Evaluation Report summarizing the deliberations relating to Tung's application for tenure; and (4) comparable portions of the tenure-review files of the five males. The University urged the Commission to "adopt a balancing approach reflecting the constitutional and societal interest inherent in the peer review process" and to resort to "all feasible methods to minimize the intrusive effects of its investigations." Exhibit 2 to EEOC's Memorandum in Support of Application for Order to Show Cause 6.

The Commission denied the University's application. It concluded that the withheld documents were needed in order to determine the merit of Tung's charges. The Commission found: "There has not been enough data supplied in order for the Commission to determine whether there is reasonable cause to believe that the allegations of sex, race and national origin discrimination is *[sic]* true." App. to Pet. for Cert. A31. The Commission rejected petitioner's contention that a letter, which set forth the Personnel Committee's reasons for denying Tung tenure, was sufficient for disposition of the charge. "The Commission would fall short of its obligation" to investigate charges of discrimination, the EEOC's order

stated, "if it stopped its investigation once [the employer] has . . . provided the reasons for its employment decisions, without verifying whether that reason is a pretext for discrimination." *Id.*, at A32. The Commission also rejected petitioner's proposed balancing test, explaining that "such an approach in the instant case . . . would impair the Commission's ability to fully investigate this charge of discrimination." *Id.*, at A33. The Commission indicated that enforcement proceedings might be necessary if a response was not forthcoming within 20 days. *Ibid.*

The University continued to withhold the tenure-review materials. The Commission then applied to the United States District Court for the Eastern District of Pennsylvania for enforcement of its subpoena. The court entered a brief enforcement order.[1] *Id.*, at A35.

The Court of Appeals for the Third Circuit affirmed the enforcement decision. 850 F. 2d 969 (1988).[2] Relying upon its earlier opinion in *EEOC* v. *Franklin and Marshall Col-*

---

[1] Three days before the stated 20-day period expired, petitioner brought suit against the EEOC in the United States District Court for the District of Columbia seeking declaratory and injunctive relief and an order quashing the subpoena. App. 4. The Pennsylvania District Court declined to follow its controlling court's announced "first-filed" rule, which counsels the stay or dismissal of an action that is duplicative of a previously filed suit in another federal court. See *Crosley Corp.* v. *Hazeltine Corp.*, 122 F. 2d 925, 929 (CA3 1941), cert. denied, 315 U. S. 813 (1942); *Compagnie des Bauxites de Guinea* v. *Insurance Co. of North America*, 651 F. 2d 877, 887, n. 10 (CA3 1981), cert. denied *sub nom. Compagnie des Bauxites de Guinee* v. *Insurance Corp. of Ireland, Ltd.*, 457 U. S. 1105 (1982). This declination, however, was upheld by the Third Circuit. See 850 F. 2d 969, 972 (1988). Since the applicability of the "first-filed" rule to the facts of this case is not a question on which we granted certiorari, we do not address it.

[2] The Court of Appeals did not rule on the question whether the Commission's subpoena permits petitioner to engage in any redaction of the disputed records before producing them, because the District Court had not fully considered that issue. The Third Circuit therefore ordered that the case be remanded for further consideration of possible redaction. See *id.*, at 982.

*lege*, 775 F. 2d 110 (1985),.cert. denied, 476 U. S. 1163 (1986), the court rejected petitioner's claim that policy considerations and First Amendment principles of academic freedom required the recognition of a qualified privilege or the adoption of a balancing approach that would require the Commission to demonstrate some particularized need, beyond a showing of relevance, to obtain peer review materials. Because of what might be thought of as a conflict in approach with the Seventh Circuit's decision in *EEOC* v. *University of Notre Dame du Lac*, 715 F. 2d 331, 337 (1983), and because of the importance of the issue, we granted certiorari limited to the compelled-disclosure question. 488 U. S. 992 (1988), and amended, 490 U. S. 1015 (1989).

## II

As it had done before the Commission, the District Court, and the Court of Appeals, the University raises here essentially two claims. First, it urges us to recognize a qualified common-law privilege against disclosure of confidential peer review materials. Second, it asserts a First Amendment right of "academic freedom" against wholesale disclosure of the contested documents. With respect to each of the two claims, the remedy petitioner seeks is the same: a requirement of a judicial finding of particularized necessity of access, beyond a showing of mere relevance, before peer review materials are disclosed to the Commission.

## A

Petitioner's common-law privilege claim is grounded in Federal Rule of Evidence 501. This provides in relevant part:

> "Except as otherwise required by the Constitution . . . as provided by Act of Congress or in rules prescribed by the Supreme Court . . . , the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

The University asks us to invoke this provision to fashion a new privilege that it claims is necessary to protect the integrity of the peer review process, which in turn is central to the proper functioning of many colleges and universities. These institutions are special, observes petitioner, because they function as "centers of learning, innovation and discovery." Brief for Petitioner filed June 23, 1989, p. 24 (hereinafter Brief for Petitioner).

We do not create and apply an evidentiary privilege unless it "promotes sufficiently important interests to outweigh the need for probative evidence . . . ." *Trammel* v. *United States*, 445 U. S. 40, 51 (1980). Inasmuch as "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence,'" *id.*, at 50, quoting *United States* v. *Bryan*, 339 U. S. 323, 331 (1950), any such privilege must "be strictly construed." 445 U. S., at 50.

Moreover, although Rule 501 manifests a congressional desire "not to freeze the law of privilege" but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, *id.*, at 47, we are disinclined to exercise this authority expansively. We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself. Cf. *Branzburg* v. *Hayes*, 408 U. S. 665, 706 (1972). The balancing of conflicting interests of this type is particularly a legislative function.

With all this in mind, we cannot accept the University's invitation to create a new privilege against the disclosure of peer review materials. We begin by noting that Congress, in extending Title VII to educational institutions and in providing for broad EEOC subpoena powers, did not see fit to create a privilege for peer review documents.

When Title VII was enacted originally in 1964, it exempted an "educational institution with respect to the employment of individuals to perform work connected with the educational

activities of such institution." § 702, 78 Stat. 255. Eight years later, Congress eliminated that specific exemption by enacting § 3 of the Equal Employment Opportunity Act of 1972, 86 Stat. 103. This extension of Title VII was Congress' considered response to the widespread and compelling problem of invidious discrimination in educational institutions. The House Report focused specifically on discrimination in higher education, including the lack of access for women and minorities to higher ranking (*i. e.*, tenured) academic positions. See H. R. Rep. No. 92–238, pp. 19–20 (1971). Significantly, opponents of the extension claimed that enforcement of Title VII would weaken institutions of higher education by interfering with decisions to hire and promote faculty members.[3] Petitioner therefore cannot seriously contend that Congress was oblivious to concerns of academic autonomy when it abandoned the exemption for educational institutions.

The effect of the elimination of this exemption was to expose tenure determinations to the same enforcement procedures applicable to other employment decisions. This Court previously has observed that Title VII "sets forth 'an integrated, multistep enforcement procedure' that enables the Commission to detect and remedy instances of discrimination." *EEOC* v. *Shell Oil Co.*, 466 U. S. 54, 62 (1984), quoting *Occidental Life Ins. Co.* v. *EEOC*, 432 U. S. 355, 359 (1977). The Commission's enforcement responsibilities are triggered by the filing of a specific sworn charge of discrimination. The Act obligates the Commission to investigate a charge of discrimination to determine whether there is "reasonable cause to believe that the charge is true." 42 U. S. C. § 2000e–5(b) (1982 ed.). If it finds no such reasonable cause, the Commission is directed to dismiss the charge. If it does find reasonable cause, the Commission shall "endeavor to eliminate [the] alleged unlawful employ-

---

[3] See, *e. g.*, 118 Cong. Rec. 311 (1972) (remarks of Sen. Ervin); *id.*, at 946 (remarks of Sen. Allen); *id.*, at 4919 (remarks of Sen. Ervin).

ment practice by informal methods of conference, concilia-
tion, and persuasion." *Ibid.* If attempts at voluntary reso-
lution fail, the Commission may bring an action against the
employer. § 2000e–5(f)(1).[4]

To enable the Commission to make informed decisions at
each stage of the enforcement process, § 2000e–8(a) confers a
broad right of access to relevant evidence:

> "[T]he Commission or its designated representative shall
> at all reasonable times have access to, for the purposes of
> examination, and the right to copy any evidence of any
> person being investigated . . . that relates to unlawful
> employment practices covered by [the Act] and is rele-
> vant to the charge under investigation."

If an employer refuses to provide this information volun-
tarily, the Act authorizes the Commission to issue a subpoena
and to seek an order enforcing it. § 2000e–9 (incorporating
29 U. S. C. § 161).

On their face, §§ 2000e–8(a) and 2000e–9 do not carve out
any special privilege relating to peer review materials, de-
spite the fact that Congress undoubtedly was aware, when it
extended Title VII's coverage, of the potential burden that
access to such material might create. Moreover, we have
noted previously that when a court is asked to enforce a Com-
mission subpoena, its responsibility is to "satisfy itself that
the charge is valid and that the material requested is 'rele-
vant' to the charge . . . and more generally to assess any con-
tentions by the employer that the demand for information is
too indefinite or has been made for an illegitimate purpose."
It is not then to determine "whether the charge of discrimina-
tion is 'well founded' or 'verifiable.'" *EEOC* v. *Shell Oil
Co.*, 466 U. S., at 72, n. 26.

The University concedes that the information sought by
the Commission in this case passes the relevance test set

---

[4] Similarly, the charging party may bring an action after it obtains a
"right-to-sue" letter from the Commission. § 2000e–5(f)(1).

forth in *Shell Oil.* Tr. of Oral Arg. 6. Petitioner argues, nevertheless, that Title VII affirmatively grants courts the discretion to require more than relevance in order to protect tenure review documents. Although petitioner recognizes that Title VII gives the Commission broad "power to *seek* access to all evidence that may be 'relevant to the charge under investigation,'" Brief for Petitioner 38 (emphasis added), it contends that Title VII's subpoena enforcement provisions do not give the Commission an unqualified right to *acquire* such evidence. *Id.*, at 38–41. This interpretation simply cannot be reconciled with the plain language of the text of § 2000e–8(a), which states that the Commission "*shall . . . have* access" to "*relevant*" evidence (emphasis added). The provision can be read only as giving the Commission a right to obtain that evidence, not a mere license to seek it.

Although the text of the access provisions thus provides no privilege, Congress did address situations in which an employer may have an interest in the confidentiality of its records. The same § 2000e–8 which gives the Commission access to any evidence relevant to its investigation also makes it "unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding" under the Act. A violation of this provision subjects the employee to criminal penalties. *Ibid.* To be sure, the protection of confidentiality that § 2000e–8(e) provides is less than complete.[5] But this, if anything, weakens petitioner's argument. Congress apparently considered the issue of confidentiality, and it provided a modicum of protection. Petitioner urges us to go further than Congress thought necessary to safeguard that value, that is, to strike the balance differently from the one Congress adopted. Petitioner, how-

---

[5] The prohibition on Commission disclosure does not apply, for example, to the charging party. See *EEOC* v. *Associated Dry Goods Corp.*, 449 U. S. 590, 598–604 (1981).

ever, does not offer any persuasive justification for that suggestion.

We readily agree with petitioner that universities and colleges play significant roles in American society. Nor need we question, at this point, petitioner's assertion that confidentiality is important to the proper functioning of the peer review process under which many academic institutions operate. The costs that ensue from disclosure, however, constitute only one side of the balance. As Congress has recognized, the costs associated with racial and sexual discrimination in institutions of higher learning are very substantial. Few would deny that ferreting out this kind of invidious discrimination is a great, if not compelling, governmental interest. Often, as even petitioner seems to admit, see Reply Brief for Petitioner 15, disclosure of peer review materials will be necessary in order for the Commission to determine whether illegal discrimination has taken place. Indeed, if there is a "smoking gun" to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files. The Court of Appeals for the Third Circuit expressed it this way:

> "Clearly, an alleged perpetrator of discrimination cannot be allowed to pick and choose the evidence which may be necessary for an agency investigation. There may be evidence of discriminatory intent and of pretext in the confidential notes and memorand[a] which the [college] seeks to protect. Likewise, confidential material pertaining to other candidates for tenure in a similar time frame may demonstrate that persons with lesser qualifications were granted tenure or that some pattern of discrimination appears. . . . [T]he peer review material itself must be investigated to determine whether the evaluations are based in discrimination and whether they are reflected in the tenure decision." *EEOC* v. *Franklin and Marshall College*, 775 F. 2d, at 116 (emphasis deleted).

Moreover, we agree with the EEOC that the adoption of a requirement that the Commission demonstrate a "specific reason for disclosure," see Brief for Petitioner 46, beyond a showing of relevance, would place a substantial litigation-producing obstacle in the way of the Commission's efforts to investigate and remedy alleged discrimination. Cf. *Branzburg* v. *Hayes*, 408 U. S., at 705–706. A university faced with a disclosure request might well utilize the privilege in a way that frustrates the EEOC's mission. We are reluctant to "place a potent weapon in the hands of employers who have no interest in complying voluntarily with the Act, who wish instead to delay as long as possible investigations by the EEOC." *EEOC* v. *Shell Oil Co.*, 466 U. S., at 81.

Acceptance of petitioner's claim would also lead to a wave of similar privilege claims by other employers who play significant roles in furthering speech and learning in society. What of writers, publishers, musicians, lawyers? It surely is not unreasonable to believe, for example, that confidential peer reviews play an important part in partnership determinations at some law firms. We perceive no limiting principle in petitioner's argument. Accordingly, we stand behind the breakwater Congress has established: unless specifically provided otherwise in the statute, the EEOC may obtain "relevant" evidence. Congress has made the choice. If it dislikes the result, it of course may revise the statute.

Finally, we see nothing in our precedents that supports petitioner's claim. In *United States* v. *Nixon*, 418 U. S. 683 (1974), upon which petitioner relies, we recognized a qualified privilege for Presidential communications. It is true that in fashioning this privilege we noted the importance of confidentiality in certain contexts:

> "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.*, at 705.

But the privilege we recognized in *Nixon* was grounded in the separation of powers between the branches of the Federal Government. "[T]he privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings." *Id.*, at 705–706 (footnote omitted). As we discuss below, petitioner's claim of privilege lacks similar constitutional foundation.

In *Douglas Oil Co. of Cal.* v. *Petrol Stops Northwest*, 441 U. S. 211 (1979), the Court recognized the privileged nature of grand jury proceedings. We noted there that the rule of secrecy dated back to the 17th century, was imported into our federal common law, and was eventually codified in Federal Rule of Criminal Procedure 6(e) as "an integral part of our criminal justice system." 441 U. S., at 218, n. 9. Similarly, in *Clark* v. *United States*, 289 U. S. 1, 13 (1933), the Court recognized a privilege for the votes and deliberations of a petit jury, noting that references to the privilege "bear with them the implications of an immemorial tradition." More recently, in *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132 (1975), we construed an exception to the Freedom of Information Act in which Congress had incorporated a well-established privilege for deliberative intraagency documents. A privilege for peer review materials has no similar historical or statutory basis.

B

As noted above, petitioner characterizes its First Amendment claim as one of "academic freedom." Petitioner begins its argument by focusing our attention upon language in prior cases acknowledging the crucial role universities play in the dissemination of ideas in our society and recognizing "academic freedom" as a "special concern of the First Amendment." *Keyishian* v. *Board of Regents of University of New York*, 385 U. S. 589, 603 (1967). In that case the Court said:

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." See also *Adler* v. *Board of Education of City of New York,* 342 U. S. 485, 511 (1952) (academic freedom is central to "the pursuit of truth which the First Amendment was designed to protect" (Douglas, J., dissenting)). Petitioner places special reliance on Justice Frankfurter's opinion, concurring in the result, in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 263 (1957), where the Justice recognized that one of "four essential freedoms" that a university possesses under the First Amendment is the right to "determine for itself on academic grounds *who may teach*" (emphasis added).

Petitioner contends that it exercises this right of determining "on academic grounds who may teach" through the process of awarding tenure. A tenure system, asserts petitioner, determines what the university will look like over time. "In making tenure decisions, therefore, a university is doing nothing less than shaping its own identity." Brief for Petitioner 19.

Petitioner next maintains that the peer review process is the most important element in the effective operation of a tenure system. A properly functioning tenure system requires the faculty to obtain candid and detailed written evaluations of the candidate's scholarship, both from the candidate's peers at the university and from scholars at other institutions. These evaluations, says petitioner, traditionally have been provided with express or implied assurances of confidentiality. It is confidentiality that ensures candor and enables an institution to make its tenure decisions on the basis of valid academic criteria.

Building from these premises, petitioner claims that requiring the disclosure of peer review evaluations on a finding of mere relevance will undermine the existing process of awarding tenure, and therefore will result in a significant infringement of petitioner's First Amendment right of aca-

demic freedom.  As more and more peer evaluations are disclosed to the EEOC and become public, a "chilling effect" on candid evaluations and discussions of candidates will result. And as the quality of peer review evaluations declines, tenure committees will no longer be able to rely on them.  "This will work to the detriment of universities, as less qualified persons achieve tenure causing the quality of instruction and scholarship to decline." *Id.*, at 35.  Compelling disclosure of materials "also will result in divisiveness and tension, placing strain on faculty relations and impairing the free interchange of ideas that is a hallmark of academic freedom." *Ibid.*  The prospect of these deleterious effects on American colleges and universities, concludes petitioner, compels recognition of a First Amendment privilege.

In our view, petitioner's reliance on the so-called academic-freedom cases is somewhat misplaced.  In those cases government was attempting to control or direct the *content* of the speech engaged in by the university or those affiliated with it.  In *Sweezy*, for example, the Court invalidated the conviction of a person found in contempt for refusing to answer questions about the content of a lecture he had delivered at a state university.  Similarly, in *Keyishian*, the Court invalidated a network of state laws that required public employees, including teachers at state universities, to make certifications with respect to their membership in the Communist Party.  When, in those cases, the Court spoke of "academic freedom" and the right to determine on "academic grounds who may teach" the Court was speaking in reaction to content-based regulation.  See *Sweezy* v. *New Hampshire*, 354 U. S., at 250 (plurality opinion discussing problems that result from imposition of a "strait jacket upon the intellectual leaders in our colleges and universities"); *Keyishian* v. *Board of Regents*, 385 U. S., at 603 (discussing dangers that are present when a "pall of orthodoxy" is cast "over the classroom").

Fortunately, we need not define today the precise contours of any academic-freedom right against governmental attempts to influence the content of academic speech through the selection of faculty or by other means,[6] because petitioner does not allege that the Commission's subpoenas are intended to or will in fact direct the content of university discourse toward or away from particular subjects or points of view. Instead, as noted above, petitioner claims that the "quality of instruction and scholarship [will] decline" as a result of the burden EEOC subpoenas place on the peer review process.

Also, the cases upon which petitioner places emphasis involved *direct* infringements on the asserted right to "determine for itself on academic grounds who may teach." In *Keyishian*, for example, government was attempting to *substitute* its teaching employment criteria for those already in place at the academic institutions, directly and completely usurping the discretion of each institution. In contrast, the EEOC subpoena at issue here effects no such usurpation. The Commission is not providing criteria that petitioner *must* use in selecting teachers. Nor is it preventing the University from using any criteria it may wish to use, except those—including race, sex, and national origin—that are proscribed under Title VII.[7] In keeping with Title VII's

---

[6] Obvious First Amendment problems would arise where government attempts to direct the content of speech at private universities. Such content-based regulation of private speech traditionally has carried with it a heavy burden of justification. See, *e. g., Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95, 98–99 (1972). Where, as was the situation in the academic-freedom cases, government attempts to direct the content of speech at public educational institutions, complicated First Amendment issues are presented because government is simultaneously both speaker and regulator. Cf. *Meese* v. *Keene*, 481 U. S. 465, 484, n. 18 (1987) (citing *Block* v. *Meese*, 253 U. S. App. D. C. 317, 327–328, 793 F. 2d 1303, 1313–1314 (1986)). See generally, M. Yudof, When Government Speaks (1983).

[7] Petitioner does not argue in this case that race, sex, and national origin constitute "academic grounds" for the purposes of its claimed First

preservation of employers' remaining freedom of choice, see *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989) (plurality opinion), courts have stressed the importance of avoiding second-guessing of legitimate academic judgments. This Court itself has cautioned that "judges . . . asked to review the substance of a genuinely academic decision . . . should show great respect for the faculty's professional judgment." *Regents of University of Michigan* v. *Ewing*, 474 U. S. 214, 225 (1985). Nothing we say today should be understood as a retreat from this principle of respect for *legitimate* academic decisionmaking.

That the burden of which the University complains is neither content based nor direct does not necessarily mean that petitioner has no valid First Amendment claim. Rather, it means only that petitioner's claim does not fit neatly within any right of academic freedom that could be derived from the cases on which petitioner relies. In essence, petitioner asks us to recognize an *expanded* right of academic freedom to protect confidential peer review materials from disclosure. Although we are sensitive to the effects that content-neutral government action may have on speech, see, *e. g.*, *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 647–648 (1981), and believe that burdens that are less than direct may sometimes pose First Amendment concerns, see, *e. g.*, *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958), we think the First Amendment cannot be extended to embrace petitioner's claim.

First, by comparison with the cases in which we have found a cognizable First Amendment claim, the infringement the University complains of is extremely attenuated. To repeat, it argues that the First Amendment is infringed by disclosure of peer review materials because disclosure undermines the confidentiality which is central to the peer review process, and this in turn is central to the tenure process, which in turn is the means by which petitioner seeks to exer-

---

Amendment right to academic freedom. Cf. *Regents of University of California* v. *Bakke*, 438 U. S. 265, 312–313 (1978) (opinion of Powell, J.).

cise its asserted academic-freedom right of choosing who will teach. To verbalize the claim is to recognize how distant the burden is from the asserted right.

Indeed, if the University's attenuated claim were accepted, many other generally applicable laws might also be said to infringe the First Amendment. In effect, petitioner says no more than that disclosure of peer review materials makes it more difficult to acquire information regarding the "academic grounds" on which petitioner wishes to base its tenure decisions. But many laws make the exercise of First Amendment rights more difficult. For example, a university cannot claim a First Amendment violation simply because it may be subject to taxation or other government regulation, even though such regulation might deprive the university of revenue it needs to bid for professors who are contemplating working for other academic institutions or in industry. We doubt that the peer review process is any more essential in effectuating the right to determine "who may teach" than is the availability of money. Cf. *Buckley* v. *Valeo*, 424 U. S. 1, 19 (1976) (discussing how money is sometimes necessary to effectuate First Amendment rights).

In addition to being remote and attenuated, the injury to academic freedom claimed by petitioner is also speculative. As the EEOC points out, confidentiality is not the norm in all peer review systems. See, *e. g.*, G. Bednash, The Relationship Between Access and Selectivity in Tenure Review Outcomes (1989) (unpublished Ph.D. dissertation, University of Maryland). Moreover, some disclosure of peer evaluations would take place even if petitioner's "special necessity" test were adopted. Thus, the "chilling effect" petitioner fears is at most only incrementally worsened by the absence of a privilege. Finally, we are not so ready as petitioner seems to be to assume the worst about those in the academic community. Although it is possible that some evaluators may become less candid as the possibility of disclosure increases, others may simply ground their evaluations in specific exam-

ples and illustrations in order to deflect potential claims of bias or unfairness. Not all academics will hesitate to stand up and be counted when they evaluate their peers.

The case we decide today in many respects is similar to *Branzburg* v. *Hayes*, 408 U. S. 665 (1972). In *Branzburg*, the Court rejected the notion that under the First Amendment a reporter could not be required to appear or to testify as to information obtained in confidence without a special showing that the reporter's testimony was necessary. Petitioners there, like petitioner here, claimed that requiring disclosure of information collected in confidence would inhibit the free flow of information in contravention of First Amendment principles. In the course of rejecting the First Amendment argument, this Court noted that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.*, at 682. We also indicated a reluctance to recognize a constitutional privilege where it was "unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury." *Id.*, at 693. See also *Herbert* v. *Lando*, 441 U. S. 153, 174 (1979). We were unwilling then, as we are today, "to embark the judiciary on a long and difficult journey to . . . an uncertain destination." 408 U. S., at 703.[8]

Because we conclude that the EEOC subpoena process does not infringe any First Amendment right enjoyed by petitioner, the EEOC need not demonstrate any special justification to sustain the constitutionality of Title VII as applied to tenure peer review materials in general or to the subpoena involved in this case. Accordingly, we need not address the

---

[8] In *Branzburg* we recognized that the bad-faith exercise of grand jury powers might raise First Amendment concerns. 408 U. S., at 707. The same is true of EEOC subpoena powers. See *EEOC* v. *Shell Oil Co.*, 466 U. S. 54, 72, n. 26 (1984). There is no allegation or indication of any such abuse by the Commission in this case.

202

Commission's alternative argument that any infringement of petitioner's First Amendment rights is permissible because of the substantial relation between the Commission's request and the overriding and compelling state interest in eradicating invidious discrimination.[9]

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[9] We also do not consider the question, not passed upon by the Court of Appeals, whether the District Court's enforcement of the Commission's subpoena will allow petitioner to redact information from the contested materials before disclosing them. See n. 2, *supra*.