**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Appellant,**

v.

**ILLINOIS DEPARTMENT OF EMPLOYMENT SECURITY, Defendant–Appellee.**

No. 92–3013.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1993.

Decided May 26, 1993.

Paula R. Bruner, E.E.O.C., Office of Gen. Counsel, Washington, DC, for plaintiff-appellant.

Roland W. Burris, Jan E. Hughes, Asst. Atty. Gen., Office of the Atty. Gen., Civ. Appeals Div., Richard S. Grenvich, Chicago, for defendant-appellee.

Before CUMMINGS, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Believing that the transcript of an unemployment compensation hearing contains evidence relevant to an investigation it is conducting, the Equal Employment Opportunity Commission asked the Illinois Department of Employment Security for a copy. The IDES refused, citing a state statute making unemployment compensation proceedings confidential. 820 Ill.Comp.Stat. § 405/1900. The EEOC then asked the district court to enforce a subpoena for the transcript. The Commission is entitled to "any evidence ... that relates to unlawful employment practices covered by [the laws it administers] and is relevant to the charge under investigation." 42 U.S.C. § 2000e–8(a). When a person refuses to provide relevant information, the EEOC may apply to a court for aid. 42 U.S.C. § 2000e–9, incorporating the subpoena provision of the National Labor Relations Act, 29 U.S.C. § 161. A district judge concluded that the transcript of the unemployment proceeding is indeed relevant to the EEOC's proceeding. But the judge refused to order the IDES to give the EEOC a copy, ruling that the state agency's interest in confidentiality outweighs the federal agency's interest in conducting its investigation. 1992 WL 159480, 1992 U.S.Dist. Lexis 9236.

When state and federal statutes clash, the Supremacy Clause of the Constitution gives the federal statute controlling force. Rule 501 of the Federal Rules of Evidence reinforces this message in the domain of evidentiary privileges. State privileges are honored in federal litigation only when state law supplies the rule of decision. When federal law governs, as it does here, only privileges recognized by the national government matter. Because state law does not apply, Rule 501 tells us to use "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Unless we absorb the state's unemployment-insurance privilege into the common law of the United States, the EEOC's subpoena must be enforced. Cf. *Memorial Hospital v. Shadur,* 664 F.2d 1058, 1061 (7th Cir.1981) (incorporating one state privilege as a matter of comity). That the IDES is a third party rather than the complainant's employer does not matter. Nothing in §§ 2000e–8(a) and 161 distinguishes third-party subpoenas from others for purposes of evidentiary privileges.

Federal common law recognizes many privileges, and the traditional ones are available even though a federal agency invokes a broad statutory power to gather evidence. E.g., *Upjohn Co. v. United States,* 449 U.S. 383, 397–99, 101 S.Ct. 677, 686–87, 66 L.Ed.2d 584 (1981) (summonses issued by the IRS under 26 U.S.C. § 7602 are subject to established privileges such as the attorney work-product doctrine). *University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), warns against augmenting the list. A university contended that the disclosure of details about evaluations of candidates for tenure would jeopardize the advancement of knowledge by interfering with candid, and thus accurate, assessment of academic achievements and potential. The Court conceded that disclosure might have such effects but concluded that existing law nonetheless entitled the Commission to obtain the information. Courts should honor statutes granting access to information. *University of Pennsylvania* joined other recent decisions that have de-

clined opportunities to create new evidentiary privileges or expand old ones. E.g., *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

An unemployment-insurance privilege is no more compelling than an academic-deliberation privilege or a reporters'-source privilege (the subject of *Branzburg*); indeed it is less so. Illinois justifies its privilege as a way to encourage truthful and complete disclosure to state officials; people who do not fear that evidence will fall into the hands of persons who may use it against them will be more forthcoming, the argument goes. This is far from clear; one could as readily say that people who know that third parties will not examine the evidence have less to fear from telling lies—for the truth is less likely to emerge. Perhaps secrecy emboldens workers to seek unemployment benefits, freeing them from the fear that the employer will reply by advancing "cause" for the discharge that will hinder their efforts to find other jobs. Again, however, this is a two-edged argument: an employee with less to fear from calumny is more likely to claim benefits to which he is entitled, but secrecy also enables employees to bamboozle other employers by hiding the true reasons for their separations. Finally, Illinois tells us that confidentiality makes adjudication of requests for unemployment compensation simpler. Administrative convenience has never been an adequate reason to keep evidence out of prosecutors' hands. See *United States v. Wilson,* 960 F.2d 48 (7th Cir.1992), holding that Illinois must disclose unemployment compensation records to a federal prosecutor for use in a mail fraud case. The EEOC investigates and prosecutes civil rights cases; it has no lesser entitlement to these records.

Unless a federal statute diminishes the EEOC's access to unemployment data. Perhaps one has. The Illinois privilege statute contains numerous exceptions, drawn in accord with 42 U.S.C. § 503. Congress demanded that states make their unemployment compensation records fully available to the Railroad Retirement Board, § 503(c)(1), and provide selected information to other federal agencies, such as the Department of Agriculture for use in operating the food stamp program, § 503(d)(1)(A). This sets up a skirmish of interpretive maxims. Illinois invokes *expressio unius est exclusio alterius:* having given designated federal agencies access to specified unemployment records, Congress implicitly excluded other federal agencies from unbridled access to these documents. The EEOC responds with the presumption that Congress knows the law. Section 503 was part of the unemployment compensation system long before Congress created the EEOC's investigatory powers; surely Congress would have written down any limitations on the new powers that it established. Illinois reflects this argument back at the EEOC by observing that § 503 was last amended in 1992, long after the EEOC received its powers; surely Congress would have included the EEOC in § 503 had it wanted the EEOC to obtain unemployment records, the state insists.

Such badminton with the canons of construction does nothing beyond demonstrating their limited utility. Far better to examine the statutes themselves. Three aspects of the laws at issue provide essential information about their meaning. First, § 503 sets conditions on which the federal government will reimburse states for part of the cost of their unemployment insurance programs. States may accept these conditions and receive federal money or decline the conditions and operate their programs as they choose. Federal strings attached to this compensation are most sensibly understood as creating access to information *beyond* what the agencies otherwise would possess, not as revoking other rights of access. In other words, § 503 curtails state confidentiality statutes, not federal subpoena powers. Second, § 503 establishes *routine* access to information. The state must turn over information for tax and food stamp purposes automatically. Section 503 deals with the legal consequences of unemployment compensation—the tax collector receives data so that the benefits may be taxed, the Department of Agriculture so that income may be reflected properly in the food stamp program, and so on—while other statutes govern access to information that is relevant to other programs. Nothing in

§ 503 deals with non-routine access. Before enforcing a subpoena, a federal judge must determine that the evidence sought is relevant to an ongoing investigation and that the demand is not excessively burdensome. Cf. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984). Third, the EEOC's own statutes provide for confidentiality. As the Court stressed in *University of Pennsylvania,* "[t]he same § 2000e–8 which gives the Commission access to any evidence relevant to its investigation also makes it 'unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding' under the Act.... Congress apparently considered the issue of confidentiality, and it provided a modicum of protection." 493 U.S. at 192, 110 S.Ct. at 584. Section 503 can exist comfortably alongside § 2000e–8; each serves an independent purpose.

Illinois reminds us that *Herman Brothers Pet Supply, Inc. v. NLRB*, 360 F.2d 176, 179–80 (6th Cir.1966), held that a state statutory unemployment-compensation privilege prevented the use of information in a proceeding before the NLRB. Because the EEOC has the same evidence-gathering powers as the NLRB, Illinois insists, the EEOC is equally limited. *Herman Brothers* predates both *University of Pennsylvania* and the adoption of Fed.R.Evid. 501. The sixth circuit assumed that state privileges apply in federal litigation. That assumption is no longer warranted.

REVERSED.