**Abir QAMHIYAH, Plaintiff,**

v.

**IOWA STATE UNIVERSITY OF SCIENCE AND TECHNOLOGY and The Board of Regents of the State of Iowa, Defendant.**

No. 4:06–CV–187.

United States District Court, S.D. Iowa. Central Division.

Sept. 7, 2007.

**394**

Ann–Marie H. Kendell, Elizabeth A. Coonan, James H. Gilliam, Brown Winick Graves Gross Baskerville Schoenebaum, Des Moines, IA, for Plaintiff.

George A. Carroll, Department of Justice, Paula K. Deangelo, Attorney General of Iowa, Des Moines, IA, for Defendant.

## RULING ON PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

WALTERS, United States Magistrate Judge.

The Court has before it plaintiff's motion to compel production of documents [17], filed May 30, 2007. Defendants responded to the motion June 18, 2007. Plaintiff filed a reply brief on June 28, 2007. A hearing was held July 19, 2007. The matter is considered fully submitted.

### I. BACKGROUND

Plaintiff Abir Qamhiyah is "a female of Palestinian national origin and a member of the Muslim faith" who was appointed in 1996 to a tenure-track position as an Assistant Professor of Mechanical Engineering at the defendant Iowa State University of Science and Technology. (Complaint ¶¶ 2, 7, 8). She has sued the University and the Board of Regents of the State of Iowa (collectively hereinafter "ISU") alleging that ISU unlawfully discriminated against her on the basis of national origin, sex, pregnancy and religion in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Iowa Civil Rights Act ("ICRA") when it denied her application for promotion and tenure in 2004. 42 U.S.C. § 2000e *et seq.;* Iowa Code Ch. 216. During the discovery process, plaintiff requested various documents relating to the promotion and tenure appeals process, including: (1) "a copy of all drafts, notes (typed or handwritten), memoranda or other documents generated in conjunction with the October 26, 2004 Ad Hoc Investigative Subcommittee report"; (2) "all documents generated during the interviews of anyone regarding plaintiff's promotion and tenure review appeal as a result of the contacts identified in Defendants Answer to Interrogatory No. 16"; and (3) "all documents, notes, email communication, responses and memoranda generated by the members of the Ad Hoc Investigative Subcommittee in producing the October 26, 2004, Ad Hoc Investigative Subcommittee Report." (Pl. Exhibit A).

■ ISU refused to provide the requested documents on the basis of the deliberative process privilege. (Pl. Exhibit A). It has produced a privilege log of the documents which lists forty-one allegedly privileged items. The Court has reviewed the documents *in camera* ("the disputed documents"). Plaintiff filed a motion to compel production. As a preliminary matter, the Court notes federal law provides the rule of decision in this case, hence federal law governs the privilege issue. Fed.R.Evid. 501.[1]

### II. APPLICABLE LAW AND DISCUSSION

The decision whether to grant tenure to a faculty member is an important one for both the faculty member concerned and ISU.[2] For the faculty member denial of tenure is career-ending, at least at ISU. The hearing record indicates faculty members whose tenure applications are denied are expected to move on. For the University an award of tenure represents commitment to a life-time appointment of the faculty member as a professor in an academic department. It is not surprising then that the tenure decisional process is multilayered with input from "a multitude of individuals," (Def. Resp. at 1), including a department promotion and tenure committee made up of faculty members from the applicant's department, the chair of the department, a promotion and tenure committee made up of faculty members from the department's college, the Dean of the college, the Provost and University President. ISU also solicits letters of evaluation from peers in the applicant's field outside of the University. If this process results in a denial of tenure, the applicant may appeal the decision to ISU's Faculty Senate Committee on Appeals ("FSCA") which is "responsible for in-

---

**1.** Iowa courts analyze ICRA discrimination claims under the same analytical framework as the federal courts under Title VII. *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 616 n. 2 (8th Cir.2007).

**2.** ISU notes that faculty members being considered for tenure often apply for promotion to the academic rank of Associate Professor at the same time. Like ISU, for ease of reference, the Court will only refer to plaintiff's tenure application.

vestigating and recommending a course of action for appeals filed by faculty members who believe they have been treated unfairly with respect to employment matters." (Freeman Aff. ¶ 2). The chairperson of the FSCA appoints three faculty members to serve as an Ad Hoc Investigative Subcommittee ("AHIC") to investigate and submit a report to the FSCA with a tentative recommendation for disposition of the appeal. The FSCA then reviews the AHIC's report and ultimately submits a report with a recommendation to the Provost. The Provost has the final word. When plaintiff's tenure application was denied, she followed the appeal process to its completion.

During the course of discovery ISU has produced a great deal of documentation created in connection with the original tenure denial decision, including written recommendations and the external letters of those who evaluated the plaintiff's work. It has produced similar documentation pertaining to other faculty members in the Mechanical Engineering Department who sought tenure in the last ten years. It has produced the report of the AHIC and the FSCA's recommendation to the Provost. What it has withheld under its assertion of the deliberative process privilege are draft committee reports, the notes of AHIC and FSCA members involved in reviewing plaintiff's appeal, and e-mails between AHIC and FSCA members pertaining to the issues raised by plaintiff in her appeal. Those issues involved allegations of improper procedures, the use of arbitrary criteria and, if not an express basis for plaintiff's appeal, background concerns expressed by plaintiff about the role her gender may have played at the department level in denying tenure. The Court's review of the disputed documents indicates they, to varying degrees, reveal the mental impressions and thought process on these subjects of faculty members involved in the appeal process. The documents are relevant to the ultimate issue in this case of whether a prohibited reason was a motivating factor in the decision to deny tenure to plaintiff.

 "The purpose of the deliberative process privilege is to allow agencies freely to explore alternative avenues of action and to engage in internal debates without fear of public scrutiny." *Missouri ex rel. Shorr v. United States Army Corps of Eng'rs,* 147 F.3d 708, 710 (8th Cir.1998). The privilege has as its overall object enhancing "the quality of agency decisions by protecting open and frank discussion among those who make them within Government." *Dept. of Interior v. Klamath Water Users Protective Assoc.,* 532 U.S. 1, 9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001)(quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). The privilege, however, is a qualified one and is subject to exceptions. It only protects documents which are both (1) pre-decisional and (2) deliberative. *Shorr,* 147 F.3d at 710. Where it exists it may be overcome by a showing that the non-governmental party's need for the information outweighs the government's interest in non-disclosure. *See L.H., et al. v. Schwarzenegger,* 2007 WL 1531420, *4 (E.D.Cal.2007); *Chaplaincy of Full Gospel Churches v. Johnson,* 217 F.R.D. 250, 257 (D.D.C.2003). Usually four factors weigh in the balance: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *F.T.C. v. Warner Communications, Inc.,* 742 F.2d 1156, 1161 (9th Cir.1984). There is another factor at work in this case, and that is the strong public policy against employment discrimination represented by Title VII.

 ISU is a public university governed by the defendant Board of Regents. Iowa Code § 262.7. The Court will assume ISU may be considered a state agency for the purposes of the deliberative process privilege. Whether all the disputed documents are deliberative is arguable, but for the purposes of the present motion it is fair to view them as "part of [ISU's] deliberative process." *Shorr,* 147 F.3d at 710. There is no question the documents are pre-decisional. Nonetheless, for two related reasons the Court has concluded the deliberative process privilege does not protect the disputed documents from disclosure. First, they are subject to the exception which applies when the

plaintiff's cause of action puts into issue the government's intent in making the decision which resulted from the deliberative process and second, the balancing process favors plaintiff because ISU's interest in non-disclosure does not weigh very heavily in an employment discrimination case.

■ In this case plaintiff alleges that the deliberative process ISU seeks to protect was tainted with unlawful discrimination. Title VII and ICRA afford her a statutory right to examine the process for improper motive. As the District of Columbia Circuit has recognized where the law casts a light on the deliberative process itself there is no room for the privilege.

> ... If the plaintiff's cause of action is directed at the government's intent ... it makes no sense to permit the government to use the privilege as a shield. For instance, it seems rather obvious to us that the privilege has no place in a Title VII action or in a constitutional claim for discrimination.... The argument is absent in these cases because if either the Constitution or a statute makes the nature of governmental officials' deliberations *the* issue, the privilege is a nonsequitur. The central purpose of the privilege is to foster government decision-making by protecting it from the chill of potential disclosure .... If Congress creates a cause of action that deliberately exposes government decision-making to the light, the privilege's raison d'être evaporates.

*In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency,* 145 F.3d 1422, 1424 (D.C.Cir.1998) (citations omitted, emphasis original). *See, e.g., New York v. Oneida Indian Nation of New York,* 2007 WL 2287878, \*14 (N.D.N.Y.2007); *United States v. Lake County Bd. of Commissioners,* 233 F.R.D. 523, 526 (N.D.Ind.2005); *Tri–State Hospital Supply Corp. v. United States,* 226 F.R.D. 118, 134–35 (D.D.C.2005); *McPeek v. Ashcroft,* 202 F.R.D. 332, 335 (D.D.C.2001). If the deliberative process privilege applied here, the members of the FSCA and AHIC committees could have freely debated the relative merits of men and women as mechanical engineering professors without fear of disclosure.[3] Clearly, applying the deliberative process privilege to an allegedly discriminatory employment decision would impair enforcement of Title VII by shielding probative evidence of motivation from view.

If the deliberative process privilege could apply to the disputed documents, the balance of interests would support their disclosure. The documents are, as noted, relevant to the ultimate issue in the case. Plaintiff is not on a pure fishing expedition; these documents shed light on the reasons why she was denied tenure. While plaintiff has had access to the materials supplied to the FSCA and AHIC and the reports emanating from them, she has no evidence about how the FSCA and AHIC members individually reacted to her appeal points or the suggestion that discrimination was involved in the underlying tenure decision, or what they discussed among themselves. ISU's role in the litigation is not collateral, but as a party whose motivation in denying tenure to plaintiff is the central issue. Finally, the Court appreciates the concerns expressed in the affidavit of current FSCA chair Dr. Steven Freeman that disclosure of the disputed documents could dissuade faculty members from serving on the FSCA, committee members from "engaging in open and frank discussions in future appeals," or cause committee members either to forego taking notes or be overly careful in what they wrote down, all of which could adversely affect the FSCA's function in reviewing tenure appeals. Disclosure of the disputed documents has the potential to hinder discussions about tenure decisions, but as the U.S. Supreme Court has previously said in a related context, this is only one side of the coin when Title VII is involved.

*University of Pennsylvania v. Equal Employment Opportunity Commission,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), involved a university faculty member who had been denied tenure. The faculty member filed a charge with the EEOC alleging

---

**3.** The Court hastens to add there is no indication in the disputed documents anything of the sort occurred.

race, sex and national origin discrimination. The EEOC issued an administrative subpoena seeking what the University described as "confidential peer review information," including "documents reflecting the internal deliberations of faculty committees considering applications for tenure." 493 U.S. at 185–86, 110 S.Ct. 577. The University resisted, arguing courts should recognize a privilege for peer review materials commonly used by institutions of higher learning in making tenure decisions. The Court rejected the proffered academic peer review privilege [4] in part because Congress, in amending Title VII to extend its reach to educational institutions,[5] had weighed the competing interests and rejected the argument of colleges and universities that extending Title VII "would weaken institutions of higher learning by interfering with decisions to hire and promote faculty members." *Id.* at 190, 110 S.Ct. 577. Congress could have, but did not, provide protection for peer review materials. Given this the Supreme Court reasoned:

> We readily agree with petitioner that universities and colleges play significant roles in American society. Nor need we question, at this point, petitioner's assertion that confidentiality is important to the proper functioning of the peer review process under which many academic institutions operate. The costs that ensue from disclosure, however, constitute only one side of the balance. As Congress has recognized, the costs associated with racial and sexual discrimination in institutions of higher learning are very substantial. Few would deny that ferreting out this kind of invidious discrimination is a great, if not compelling, governmental interest. Often ... disclosure of peer review materials will

be necessary in order for the Commission to determine whether illegal discrimination has taken place. Indeed, if there is a "smoking gun" to be found that demonstrates discrimination in tenure decisions, it is likely to be tucked away in peer review files.... "[T]he peer review material itself must be investigated to determine whether the evaluations are based in discrimination and whether they are reflected in the tenure decision."

493 U.S. at 193, 110 S.Ct. 577 (quoting in part *EEOC v. Franklin and Marshall College,* 775 F.2d 110, 116 (3d Cir.1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2288, 90 L.Ed.2d 729 (1986)); *see In re Electronic Surveillance Evidence,* 990 F.2d 1015, 1021 (8th Cir.1993)(Beam, J., dissenting: "... federal courts will not create evidentiary roadblocks where Congress has debated the issue but failed to specifically provide one itself," citing *University of Pennsylvania*).

■ The work of the FSCA and AHIC in reviewing a challenged tenure denial is the penultimate step in the process by which a final tenure decision is made at ISU. The disputed documents in this case are like those the University of Pennsylvania unsuccessfully sought to restrict access to by means of a peer review privilege. It is true ISU is not asking the Court to recognize the peer review privilege rejected by the U.S. Supreme Court, but through the deliberative process privilege—which has nothing in particular to do with academia and is available to ISU, if at all, only because of ISU's status as a public university—it is seeking the same kind of protection on the basis of the same arguments found unpersuasive by the Supreme Court. It follows that the balance of interests yields the same result here. Plain-

---

4. The proposed privilege would have been a qualified one in which the EEOC would have had to demonstrate a particularized need for peer review materials beyond a showing of relevance. 493 U.S. at 188, 110 S.Ct. 577. Analytically, it makes no difference that an EEOC subpoena was involved in *University of Pennsylvania* and here a private plaintiff seeks the information under the civil discovery rules. Plaintiff is entitled to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed.R.Civ.P. 26(b)(1).

5. When originally enacted in 1964 Title VII exempted an "educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution." *University of Pennsylvania,* 493 U.S. at 189–90, 110 S.Ct. 577 (quoting § 702, 78 Stat. 255). The subsequent extension of Title VII to educational institutions was in "response to the widespread and compelling problem of invidious discrimination in educational institutions," including "the lack of access for women and minorities to higher ranking (*i.e.,* tenured) academic positions." *Id.* at 190, 110 S.Ct. 577.

tiff's interest in access to evidence relevant to her Title VII claim outweighs the interest of ISU in preserving the confidentiality of the disputed documents in large part because in extending Title VII to educational institutions without limitation Congress weighted the balance in her favor.[6]

## III. RULING AND ORDER

■ For the reasons set forth above, the Court has concluded the disputed documents are not protected from disclosure by the deliberative process privilege. The motion to compel production of the documents will be granted. No attorney fees or expenses are awarded in consequence of the motion. ISU's non-disclosure was based on a claim of privilege which, while ultimately without merit, was not frivolous. ISU made an effort to narrow the set of documents which respect to which it claimed privilege. It prepared an adequate privilege log and willingly tendered the documents for *in camera* inspection. Nothing before the Court suggests ISU proceeded on any basis other than a good faith belief that the documents in question were privileged. In the circumstances, the Court finds an award of expenses would be unjust. Fed.R.Civ.P. 37(a)(4)(A).

Motion [17] **granted.** ISU shall produce the disputed documents to counsel for plaintiff within fourteen (14) days.

IT IS SO ORDERED.

---

**6.** While not necessary to resolution of the present motion, the Court notes it is arguable whether a tenure decision is the type of decision the deliberative process privilege would protect. The privilege does not protect all decisions made by an agency. It is intended to protect the process by which policies are formulated and important decisions are made beyond the routine. *See Scott v. Board of Education of the City of East Orange,* 219 F.R.D. 333, 337 (D.N.J.2004); *Torres v. City University of New York,* 1992 WL 380561, *7–8 (S.D.N.Y.1992) ("Torres I"), revised on oth-

er grds. following remand, 1994 WL 502621 (S.D.N.Y.1994). While tenure decisions are important, they recur with regularity at a large university. They are essentially personnel decisions involving facts specific to the applicant, and are "controlled by specific, published standards." *Torres I* at *8. (Def. Resp. to Motion, Aff. of Carlson ¶ 5 and Ex. A). The decision whether to grant plaintiff's tenure had little to do with the formulation of policy or an important governmental decision of the kind for which the privilege is typically reserved.