SILBE RMAN, Senior Circuit Judge,
concurring:
The very notion of academic freedom— as a concept distinct from the actual textual provisions of the First Amendment — is elusive. To be sure, Supreme Court cases have on occasion referred to academic freedom. See Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Keyishian v. Bd. of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Univ. of Pennsylvania v. EEOC, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). In Siveezy, a plurality of the Court said that a state investigation directed against a professor who refused to answer questions concerning his allegedly subversive lectures and political associations had violated due process, because the Attorney General of New Hampshire had lacked the necessary statutory authority to pursue his investigation of Sweezy. 345 U.S. at 254-55, 73 S.Ct. 656. The Court also stated that there “unquestionably [had been] an invasion of [Sweezy’s] liberties in the areas of academic freedom and political expression.” Id. at 250, 73 S.Ct. 656. Yet it is unclear what of substance, if anything, the phrase “academic freedom” added to Sweezy’s protections under the First Amendment.[1] And it is doubtful that a professor could assert an individual constitutional right of academic freedom against his university employer, whether state or private. For that matter, it is also doubtful that a state legislature lacks authority to oversee the content of a state university’s offerings.
Indeed, in Stveezy, the Court noted that the Supreme Court of New Hampshire had “carefully excluded” the possibility that the investigation had been based on the state’s interest in the state university, id. *238 at 249, 77 S.Ct. 1203, thereby implying that a state interest in the content of Sweezy’s lectures might stand on different footing. This same concern was raised by the Supreme Court in University of Pennsylvania, in which the Court distinguished between government attempts to direct the content of teaching at a private university, where the state acts only as a regulator, and similar efforts directed at state schools, where the state acts as a “speaker” through its faculty employees. 493 U.S. at 198 n. 6, 110 S.Ct. 577.
In Keyishian, another Cold War era case, the Court held that the First Amendment rights of employees of the State University of New York were violated when it was demanded that the employees certify, pursuant to a state statute, that they were not Communists. The Court stated that “our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is, therefore, a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.” 385 U.S. at 603, 87 S.Ct. 675. But the Court based its holding on the fact that the statute used the terms “treasonable” and “seditious” in a manner that the Court found to be unconstitutionally vague. Id. at 604, 87 S.Ct. 675. While Keyishian comes closer than Sweezy to articulating a separate right of “academic freedom,” the case nevertheless was decided on grounds that might very well appear in any standard First Amendment challenge, even absent the academic context. The Court’s holding, which did not focus on the actual content of the appellant professors’ lectures but rather on their speech and associations as private individuals, could as well be applied to any state employee — not just professors. See Urofsky, 216 F.3d at 414.
As the Court implied in University of Pennsylvania, a state university may well have a right — perhaps even an obligation — to regulate the substance of professors’ classroom lectures. 493 U.S. at 198 n. 6, 110 S.Ct. 577. For example, were a professor of history to adopt in his lectures bizarre theories of Holocaust denial or a professor of sociology to claim the inferiority of certain races or ethnic groups, surely a university would not be powerless to prevent such pedagogical perversions. After all, the state can be said to “speak” through its employees.[2] This certainly suggests that the Government may well be correct in asserting that academic freedom — if indeed it is a First Amendment concept warranting separate protection — inheres in the university, not in individual professors. It is, furthermore, difficult to see why, if the university has a right to control at least the outer limits of its professors’ lectures, a state legislature may not assert the same degree of control. I therefore share the doubts of our Fourth Circuit colleagues as to the notion that “academic freedom” is a constitutional right at all and that, should it exist, it inheres in individual professors. Urofsky, 216 F.3d at 410. (I note that the dissent in Urofsky never mentions academic freedom.) And I further join Urofsky in noting that the Supreme Court has never once invalidated a state regulation *239 on the grounds that it violated a right to academic freedom. Id. at 412.
Some have thought that academic freedom would add to the First Amendment protection for academic governance. See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 436-37, 438-39, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (Souter, J., dissenting); see also Judge Edwards’ concurrence. But recently, the Supreme Court rather dismissively referred to that notion, stating that there is “some argument” to support it. Id. at 425, 126 S.Ct. 1951. And in University of Pennsylvania, the Court treated that concept as a ground for deference akin to Chevron rather than as a constitutional right. 493 U.S. at 199, 110 S.Ct. 577. With great respect for my colleague, Judge Edwards (and Professor Judith Areen), I do not perceive any principled reason why the First Amendment should be thought to protect internal governance of certain academic institutions (are “think tanks” included?) but not other eleemosynary bodies or, for that matter, trade unions or corporations.

. Since the only professor with standing is Smith (an employee of a private university), the government is clearly not acting as a speaker, only as a regulator. Under these circumstances, it is particularly difficult to perceive any distinction between the concept of academic freedom and free speech. Any substantive governmental restriction on Smith's academic lectures would obviously violate the First Amendment. (The Coalition, which includes public university professors, cannot have broader standing than Smith.)