**UNITED STATES of America, Plaintiff,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Defendants.**

**No. 88 Civ. 4486(DNE).**

United States District Court,
S.D. New York.

April 24, 1997.

Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano (Theodore M. Lieverman, of counsel), Haddonfield, NJ, for Election Officer, Barbara Zack Quindel.

London & Mead (Christopher B. Mead, of counsel), Washington, DC, for Jere B. Nash III.

Mary Jo White, United States Attorney for the Southern District of New York (Karen B. Konigsberg, Assistant United States Attorney, of counsel), New York City, for plaintiff United States of America.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P. (Edward J.M. Little, of counsel), New York City, for defendant International Brotherhood of Teamsters.

Goldman & Hafetz (Frederick P. Hafetz, of counsel), New York City, for Cohen, Weiss & Simon.

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement of an action commenced by plaintiff United States of America (the "Government") against, *inter alia,* defendants International Brotherhood of Teamsters ("IBT") and the IBT's General Executive Board embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through a two-phased implementation of the Consent Decree's various remedial provisions.

In the first phase of the Consent Decree, these provisions provided for three court-appointed officers: the Independent Administrator to oversee the Consent Decree's provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election officer to supervise the electoral process that led up to and included the 1991 election for IBT office. In the second phase of the Consent Decree, the Independent Administrator was replaced by a three-member Independent Review Board, but the position of Election Officer remained, and was authorized to supervise the 1996 IBT elections.

Currently before this Court is *Application No. IX of the Election Officer For A Declaratory Judgment Regarding Claim of Privilege* ("Application IX"). For the following reasons, this Court finds that Application IX should be granted.

*BACKGROUND*

Under the terms of the Consent Decree, the Election Officer has the responsibility to investigate, to evaluate, and, in the event of a violation, to remedy all protests concerning IBT elections. *See* (Rules for the 1995–96 IBT International Union Delegate and Officer Election, Art. XIV, ("Election Rules").) On February 4, 1997, after Ron Carey ("Carey") was re-elected as IBT President over James Hoffa, Jr. ("Hoffa"), Hoffa filed an election protest with the Election Officer asserting that certain contributors to the Campaign to Re-elect Ron Carey (the "Carey Campaign") were made by "employers" under the Election Rules, and that therefore their contributions were prohibited under the Election Rules. (Declaration of Barbara Zack Quindel In Support of Election Officer Application IX, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Quindel Decl.") ¶ 4 (Apr. 10, 1997).) Upon receipt of this protest, the Election Officer commenced an investigation into its allegations. *Id.*

Since June 8, 1995, the New York law firm of Cohen, Weiss & Simon ("CW&S" or the "firm") has acted as counsel to the Carey Campaign. (Declaration of Susan Davis, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Davis Decl. II") ¶ 1 (Apr. 15, 1997).) Jere B. Nash III ("Nash") of Jackson, Mississippi was the Carey Campaign's Campaign Manager during the 1996 IBT election. (Quindel Decl. ¶ 5.) In the course of the Election Officer's investigation into the protest concerning the contributions to the Carey Campaign, Susan Davis ("Davis"), a partner at CW&S, informed the Election Officer that Davis and other attorneys at her firm had communications with Nash relevant to the Election Officer's investigation. *Id.* Davis further informed the

Election Officer that IBT President Carey, the Carey Campaign's authorized representative, had instructed Davis to disclose her firm's communications with Nash to the Election Officer, waiving the Carey Campaign's attorney-client privilege as to those communications. *Id.*

Davis represents that Carey authorized CW&S on behalf of the Carey Campaign, to cooperate fully with the Election Officer and to provide the Election Officer with access to all information relevant to the campaign contribution investigation. (Davis Decl. II ¶ 13.) Nash, however, contends that his communications with CW&S are subject to his personal attorney-client privilege, and that CW&S may not disclose those communications to the Election Officer without Nash's explicit waiver, which he refuses to provide. (Opposition of Jere Nash to Election Officer Application IX, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Nash Opp.") at 1–2 (Apr. 15, 1997).) CW&S is willing to disclose the substance of all its communications with Nash. (Davis Decl. II ¶ 13.) Because of Nash's assertion of privilege, however, CW&S, after conferring with its own outside counsel, has elected not to reveal the substance of any of its communications with Nash absent an order from this Court. *Id.*; (Declaration of Susan Davis, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Davis Decl. I") ¶ 4 (Apr. 9, 1997).)

The communications at issue took place on several occasions during March 1997. (Davis Decl. I ¶ 5.) On March 6, 1997, a CW&S associate was present during a telephone conversation in which Mr. Nash was questioned by an Election Office investigator regarding the alleged campaign contribution violations. *Id.* ¶ 5(a). On March 7, 1997, CW&S asked Nash to meet at the firm's offices on Saturday March 8, or Sunday March 9, 1997, in order to discuss the campaign contributions. *Id.* ¶ 5(b). Nash was unable to meet on either of those dates, but agreed to meet that Monday, March 10, 1997. *Id.* On March 10, 1997, four CW&S attorneys, Stanley Berman ("Berman"), Stephen Presser ("Presser"), Nathaniel Charney ("Charney") and Davis, met with Nash at CW&S's offices. *Id.* ¶ 5(c). Davis asserts

that at this meeting she "informed Mr. Nash that [CW&S] had asked to speak with him as counsel to the Carey Campaign and that [CW&S] w[as] investigating allegations concerning the [election protest] that had recently been brought to the attention of the Carey Campaign on behalf of the [Carey] [C]ampaign and Ron Carey." *Id.* Davis also declares that the CW&S attorneys present at this meeting informed Nash that their conversations were "privileged," by which the attorneys assumed that the privilege belonged to the firm's client, the Carey Campaign, not to Nash. *Id.* This assumption, however, was never communicated to Nash. (Hearing Transcript, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Tr.") 22 (Apr. 17, 1997).) Nash was also cautioned at the meeting that his disclosure of the substance of the meeting to individuals "outside the Carey Campaign could alter the 'privileged' nature" of the communications made during the meeting. (Davis Decl. I ¶ 5(c).) Once again, however, the CW&S attorneys "understood this privilege to belong to the Carey Campaign rather than to any individual employed by the Carey Campaign," and, once again, they neglected to inform Nash of their understanding. *Id.*

On March 12, 1997, CW&S attorneys Berman, Presser and Charney had a brief telephone conversation with Nash. *Id.* ¶ 5(d). At the end of this phone call, Nash asked the attorneys whether this conversation had been privileged. *Id.* Nash was advised by Berman and Presser that it was privileged, but, yet again, the attorneys did not explain that, in their view, the privilege belonged to the Carey Campaign, not to Nash. *Id.* On March 13, 1997, CW&S "engaged and consulted outside counsel concerning the status of [its] conversations with Mr. Nash and other legal issues that the firm had encountered in connection with the [election] protest" regarding the allegedly illegal campaign contributions. *Id.* ¶ 5(e). On March 14, 1997, Davis informed Nash that CW&S "was making a full report to Ron Carey concerning [CW&S's] conversations with Mr. Nash on March 10, 1997, and March 12, 1997." *Id.* ¶ 5(f). Nash did not object to the firm's disclosure, and acknowledged that he was aware that the firm would report the communications to Carey. *Id.* On March 18, 1997, CW&S informed Nash that he should "consider engaging per-

sonal counsel with respect to further inquiries of him from [the Election Officer]." *Id.* ¶ 5(g). Nash asserts that, upon hearing this information, he stated his belief that CW&S was his personal counsel. (Declaration of Jere Nash In Opposition to Election Officer Application No. IX, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 ("Nash Decl.") ¶ 4 (Apr. 15, 1997).) In response to Nash's statement, Davis "told Mr. Nash that CW&S represented the Carey Campaign as an entity, rather than individuals within the campaign," and that the firm had never represented Nash individually. (Davis Decl. II ¶ 11.)

Through both telephone and personal communications over the course of the next week, CW&S attorneys apprised the Election Officer and the United States Attorney's Office of the firm's situation with Nash. *Id.* ¶¶ 5(h)-(1). On March 19, 1997, Davis informed the Election Officer that Nash would likely engage personal counsel and that "certain of [the firm's] conversations with Mr. Nash were arguably subject to privilege claims by Mr. Nash, that [the] firm had sought advice of counsel with respect to those privilege issues, and that the firm believed that such privilege issues should be resolved through a prompt judicial proceeding." *Id.* ¶ 5(h). On March 21, 1997, Davis confirmed to the Election Officer that Nash had, in fact, engaged personal counsel and asserted the attorney-client privilege over his March 10 and 12, 1997, conversations with the CW&S attorneys. *Id.* ¶ 5(i). Davis also notified the Election Officer that "the firm had explained to the U.S. Attorney's [O]ffice that the appropriate course of action was to seek judicial resolution of such claims before a court of competent jurisdiction." *Id.* On March 22 and 26, 1997, Davis and Presser met with the Election Officer to describe "the facts and circumstances surrounding Mr. Nash's privilege claim," CW&S's own consultation with counsel, the need for "prompt judicial resolution of Mr. Nash's claim," and the "proper procedural approach" to such a resolution. *Id.* ¶¶ 5(j), (1). On March 24 and 27, 1997, CW&S attorneys met with at least one unidentified Assistant United States Attorney to discuss Nash's privi-

lege claim, as well as a possible judicial resolution of it. *Id.* ¶¶ 5(k), (m).

On April 10, 1997, the Election Officer filed the instant application with this Court. The Election Officer's application seeks, pursuant to her authority under the Consent Decree, a declaratory judgment that Nash possesses no attorney-client privilege with respect to his communications with CW&S. (Quindel Decl. ¶ 1.) Because of the importance of a prompt adjudication of this issue to the Election Officer's ongoing investigation into the alleged improprieties of the Carey Campaign, this Court set an expedited submission schedule and held a hearing ("the hearing") concerning this matter on April 17, 1997.

At the hearing, this Court made two preliminary rulings before proceeding to the core issue of the validity of Nash's asserted privilege. First, this Court granted Nash's unopposed motion to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), based on this Court's finding that the hearing jeopardized Nash's interest in his asserted attorney-client privilege. (Tr. 3.) Second, relying upon the substantial body of case law affirming this Court's jurisdiction over all facets of the Consent Decree, this Court rejected Nash's challenge to this Court's jurisdiction to issue a declaratory judgment adjudicating this matter to assist the Election Officer's investigative responsibilities under the Consent Decree. *Id.* at 7–8. Finally, after hearing lengthy testimony and argument, this Court found that Nash cannot assert the attorney-client privilege over his communications with CW&S, and granted the Election Officer's application in summary fashion. *Id.* at 85–86. The authority and reasoning supporting this Court's two preliminary rulings are fully set forth on the record, *id.* at 3–8, and therefore, they require no further explanation here. The instant Opinion and Order is thus dedicated to fully explaining the legal and factual foundations for this Court's determination that Nash cannot invoke the attorney-client privilege to protect his communications with CW&S regarding the allegations of improper campaign contributions.

## DISCUSSION

This Court must resolve three distinct issues in the instant Opinion and Order: (1) whether Nash may assert the attorney-client privilege over his communication with CW&S; (2) whether a declaratory judgment should issue adjudicating Nash's ability to assert that privilege; and (3) whether CW&S breached its ethical obligations under New York's Code of Professional Responsibility. This Court will address each of these questions individually.

## I. THE ATTORNEY–CLIENT PRIVILEGE

■ The attorney-client privilege applies so that

> (1) [w]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor (8) 'except the protection [can] be waived....

*In re Richard Roe, Inc.,* 68 F.3d 38, 39–40 (2d Cir.1995) (Winter, J.) (citing *United States v. Kovel,* 296 F.2d 918, 921 (2d Cir. 1961)) (Friendly, J.) (citing 8 Wigmore, Evidence § 2292 (McNaughton Rev.1961)). Permitting clients to speak to their attorneys in confidence is designed "to encourage full and frank communication between attorneys and their clients in order to promote the public interest in the observance of the law and the administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege, however, conflicts with the principle that the public has a right to "every man's evidence," and therefore must be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.1973) (Friendly, J.); *see also University of Pa. v. Equal Employment Opportunity Comm'n,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990); *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir.1989), *aff'd,* 924 F.2d 443 (2d Cir.), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991);

*Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 602 (8th Cir.1977) ("[w]hile the privilege, where it exists, is absolute, the adverse effect of its application on the disclosure of truth may be such that the privilege is strictly construed"). With these principles in mind, this Court must determine whether Nash may invoke the attorney-client privilege over his communications with CW&S. In so doing, this Court is confronted with two issues, each of which will be addressed separately: (1) the legal standard controlling whether an employee's communications with corporate counsel are subject to the employee's personal attorney-client privilege, and whether Nash meets that standard; and (2) if Nash's communications with CW&S are privileged, whether he waived that privilege.

### A. The Appropriate Legal Standard

It is undisputed that CW&S was the Carey Campaign's counsel, and, therefore, that the Carey Campaign as an organization may assert the attorney-client privilege over its communications with CW&S. *See Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682, 66 L.Ed.2d 584 (attorney-client privilege applies to corporations and other inanimate entities). However, where an attorney represents an inanimate entity, such as an election campaign, the application of the attorney-client privilege can be problematic because the entity cannot directly assert or waive the privilege, but can do so only through its agents. *See Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 347, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985); *see also Diversified Indus.,* 572 F.2d at 602. In this context, courts often are asked to determine "whether the privilege extends to communications by or to all classes of [the entity's] agents or employees[,] or whether the privilege is limited to communications by or to only limited classes of such agents or employees." *Diversified Indus.,* 572 F.2d at 596. The Supreme Court has grappled with this issue on several occasions, but has not yet established a clear standard by which such privileges are judged. *See, e.g.,* Michael A. Waldman, *Beyond Upjohn: The Attorney–Client Privilege in the Corporate Context,* 28 Wm. & Mary L.Rev. 473, 476–89

(1987) (discussing Supreme Court decisions concerning organizational attorney-client privilege). The case at bar, however, presents a rather different question. Here, this Court is not asked to determine whether the Carey Campaign may assert the attorney-client privilege over the communications of Nash, its campaign manager. Rather, the issue squarely before this Court is whether Nash may assert the privilege on his own behalf to protect his communications with the Carey Campaign's counsel, CW&S, when the Carey Campaign has stated that it will not invoke the privilege on its own behalf.

■ As the Election Officer and the Government point out, it is a general rule that "any privilege that attaches to a communication between a corporate officer and a corporate attorney concerning matters within the scope of the officer's duties or relating to the corporation's affairs belongs to the corporation, not to the individual officer." (Govt. Letter at 5); (E.O. Memo at 4–5); *see, e.g., United States v. Demauro,* 581 F.2d 50, 55 (2d Cir.1978); *In re O.P.M. Leasing Svcs., Inc.,* 13 B.R. 64, 67 (S.D.N.Y.1981) (Weinfeld, J.). Nevertheless, the Government and the Election Officer each acknowledge that courts have recognized exceptions to this general rule, but have articulated no clear standard setting forth the circumstances in which that exception applies. Unsurprisingly, the Election Officer and Nash each ask this Court to apply a different standard.

The Election Officer contends that this Court should adopt a rigorous standard for determining when an employee may invoke the attorney-client privilege over communications with corporate counsel which requires the employee to "prove [that] the attorney represented the person as an individual, rather than as a representative of the entity." (E.O. Memo at 5.) As an example of such a standard, the Election Officer offers In re *Grand Jury Investigation No. 83–30557,* 575 F.Supp. 777 (N.D.Ga.1983). Reasoning that "the attorney-client privilege is a narrowly tailored exception to the rule of full disclosure" of "every man's evidence," the *In re Grand Jury* court set forth a standard which requires the employee seeking to assert a personal privilege over communica-

tions with corporate counsel to establish: (1) that he approached corporate counsel to obtain legal advice; (2) that he clearly indicated that he was seeking legal advice in an individual, rather than a corporate, capacity; (3) that corporate counsel, aware of the potential conflict, agreed to represent him in an individual capacity; (4) that he understood his communications were confidential; and (5) that the substance of the conversation did not concern matters related to the employee's official duties or the affairs of his employer. *Id.* at 780.

Nash, on the other hand, urges this Court to apply a more lenient legal standard to determine whether an employee of an entity may assert the attorney-client privilege over communications made by the employee to the entity's counsel. (Nash Memo at 4–7.) Nash contends that the Election Officer's proposed standard unfairly places the burden upon the "layman untrained in the law ... to identify potential conflicts in a context where an attorney seems to be acting in the individual's interest." *Id.* at 6. Accordingly, Nash argues for a standard which permits an individual to assert the attorney-client privilege where the individual "had a reasonable belief he was making confidential disclosures to attorneys who were acting on his behalf." *Id.* at 4. Nash then asserts that, as Campaign Manager, it was reasonable for him to believe that the Carey Campaign's attorneys were his personal attorneys and that CW&S's assurances that his communications were privileged made it reasonable for him to believe that CW&S did, in fact, represent him individually. *Id.* at 11–12.

■ To this Court's surprise, research has revealed that the Second Circuit has not yet confronted the issue of an employee's attempted assertion of a personal attorney-client privilege over communications with his employer's counsel, and, as a result, this Court is left without binding authority establishing the appropriate standard by which to adjudicate the case at bar. The facts of this case, however, relieve this Court from the responsibility of holding that either the standards proffered by the parties or some other rule controls this Court's resolution of the instant dispute. Instead, assuming *arguendo*

the applicability of Nash's reasonable belief standard, this Court finds that Nash could not reasonably have believed that CW&S was his personal counsel, or that his communications with the firm were confidential.

The communications at issue occurred in the context of CW&S's investigation, on behalf of the Carey Campaign, into allegations of improper campaign contributions. *See* (Davis Decl. I ¶ 5(c)); (Davis Decl. II ¶¶ 6–9.) At the March 10, 1997, meeting between CW&S and Nash, Davis asserts that she "informed Mr. Nash that [CW&S] had asked to speak with him *as counsel to the Carey Campaign* ... [and] that [CW&S] needed to interview him *on behalf of the campaign* concerning the subject of [the alleged improper campaign contributions]." (Davis Decl. II ¶ 7 (emphasis added)). In addition, when CW&S informed Nash that Nash's communications with CW&S were "privileged," they did so in a manner which made it clear that the privilege existed for the benefit of its client, the Carey Campaign, not for Nash. At the March 10, 1997, Presser "cautioned Mr. Nash that the disclosure of our conversation with *persons outside the Carey Campaign* could alter the 'privileged' nature [of the meeting]." (Davis Decl. I ¶ 5(d) (emphasis added).) Likewise, Nash's conduct manifests his awareness that any privilege which existed over his communications with CW&S belonged to the Carey Campaign and Carey. On March 14, 1997, Davis informed Nash that CW&S "was making a full report to Ron Carey concerning our conversations with Mr. Nash on March 10, 1997[,] and March 12, 1997," and Nash "did not object to the firm's disclosure of those conversations to Mr. Carey and acknowledged that he was aware that [CW&S] w[as] reporting to Mr. Carey on such conversations." *Id.* ¶ 5(f).

This Court finds that a reasonable person in Nash's situation could not have believed that CW&S represented him individually, or that he personally possessed an attorney-client privilege over his communications with CW&S. Nash was informed, prior to his making the communications he now seeks to protect, that CW&S was speaking with him in the course of their investigation on behalf of the Carey Campaign. In addition, Nash was told that his communications could be disclosed to others within the Carey Campaign, and that they would be disclosed to Carey. A reasonable person could not have believed that he possessed a personal privilege while acknowledging that the information he claims to be privileged could be, and was, shared with third parties. These facts effectively undercut Nash's claim that he reasonably believed that CW&S was his personal counsel and that he possessed a personal privilege over his communications with them. *See Polycast Technology Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y.1989) (second corporate officer's presence during conversation between another officer and corporate counsel "underscored the fact that [counsel] was providing advice to a corporate, rather than an individual, client"). Accordingly, this Court finds that, even if this Court were to adopt the lenient standard Nash proposes— which it does not—Nash cannot establish that he possessed an attorney-client privilege over his communications with CW&S.

Even though this Court need not settle upon a standard governing situations in which an employee seeks to assert a personal attorney-client privilege over communications with his employer's counsel, in an effort to be thorough, this Court observes without deciding that Nash's reasonable belief standard appears inappropriate. That standard would create an unworkable, overly broad privilege which would thwart both the precept that the privilege is to be narrowly construed, *see Horowitz*, 482 F.2d at 81; *In re Grand Jury Investigation*, 575 F.Supp. at 779, and the principle that the attorney-client privilege is intended to encourage clients' disclosure to attorneys to assist their compliance with the law. *See Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682. First, as noted above, the general rule is that the attorney-client privilege belongs exclusively to an employer with respect to employees' communications with the employer's counsel, *see In re O.P.M. Leasing Svcs.*, 13 B.R. at 67, with an unclear exception which the parties urge this Court to define. Adopting the reasonable belief standard to define that exception would vastly expand the attorney-client privilege's applicability by making it available to every employ-

ee who purports to have a reasonable belief that his employer's counsel gave him personal advice. Such an exception is contrary to the narrow construction that courts are required to give the attorney-client privilege.

Moreover, this extraordinarily broad privilege would permit an employee to frustrate an internal investigation by his employer's counsel simply by claiming that his communications with counsel were based on a reasonable belief that counsel represented him. If that were so, the investigating attorneys would be precluded from disclosing the employee's communications to the employer, thus thwarting the investigation. Erecting such a wall between an employer and his counsel contravenes the attorney-client privilege's grounding principle—to facilitate compliance with the law by encouraging open and candid communication between attorneys and their clients. For these reasons, the reasonable belief standard appears to this Court to be overly broad, unworkable and contrary to well-established principles underlying the attorney-client privilege.

### B. Waiver

The Government contends that "[e]ven assuming *arguendo* that Mr. Nash somehow possessed a personal attorney-client privilege based on his conversations with [CW&S], the disclosure of the content of such conversations to Mr. Carey eliminated any such privilege." (Govt. Letter at 4.) No other party, either by submission or by oral argument, has addressed the impact of Nash's knowing disclosure of his communications to Carey on Nash's claim of privilege.

■ Waiver of an attorney-client privilege is a question of fact. *See* 3 Joseph M. McLaughlin, *et al.*, Weinstein's Federal Evidence § 503.09[1] (2d ed.1997). The attorney-client privilege is waived if the "holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication" over which the privilege is claimed. *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 468 (S.D.N.Y. 1996); *see also Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991); *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir.1990) ("the

attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that are in fact so disclosed"); 3 Weinstein's Federal Evidence § 503.09[1] ("Any disclosure of a lawyer-client communication to a third party for purposes inconsistent with maintaining confidentiality waives the attorney-client privilege as to that disclosure"). Moreover, disclosure of a privileged communication waives the privilege as to all other communications on the same subject. *See Rockwell Int'l*, 897 F.2d at 1265, 3 Weinstein's Federal Evidence § 503.09[1].

■ In the instant case, even if Nash once possessed a personal privilege with respect to his communications with CW&S regarding the campaign contribution investigation, this Court finds that he knowingly waived that privilege. The uncontroverted evidence clearly establishes that Davis informed Nash of CW&S's intention to "mak[e] a full report to Ron Carey" concerning Nash's communications with CW&S, and that Nash neither objected nor sought to prevent that disclosure. (Davis Decl. I ¶5(f).) This Court finds that Nash's failure to object serves to waive any privilege he may have had over all of his communications with CW&S concerning the campaign contribution investigation.

### II. DECLARATORY JUDGMENT

■ Having found that Nash cannot assert an attorney-client privilege over his communications with CW&S, this Court must briefly consider whether to grant the Election Officer's application for a declaratory judgment, see 28 U.S.C. § 2201 ("Section 2201"), regarding Nash's claim of privilege. Section 2201 authorizes courts in "case[s] of actual controversy within its jurisdiction [with certain exceptions not relevant here] to declare the rights and other legal relations of any interested party seeking such declaration." *Id.* The issuance of a declaratory judgment rests within this Court's discretion. *See Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir.1996); *Wilton v. Seven Falls Co.*, — U.S. —, —, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995).

In the case at bar, this Court found above that this Court possesses jurisdiction over this matter pursuant to its oversight of the Consent Decree. In addition, this Court finds that Nash's assertion of privilege impacts the Election Officer's investigative ability, and that the issuance of a declaratory judgment precluding Nash from doing so will greatly assist the Election Officer in the fulfillment of her duties under the Consent Decree. This, in turn, will promote the objectives of the Consent Decree itself, as it will help determine the existence of illegal conduct within the recent Teamsters election. This Court therefore finds that the Election officer's application for a declaratory judgment should be granted.

### III. CODE OF PROFESSIONAL RESPONSIBILITY

At the hearing, Nash questioned CW&S's compliance with the New York Code of Professional Responsibility (the "Code"). (Tr. 77–80.) Specifically, Nash asserted that Disciplinary Rule 5–109 ("DR 5–109") sets forth the ethical rule applicable to the case at bar, and required the CW&S attorneys to inform Nash that they represented the Carey Campaign, not Nash. *Id.* at 78. CW&S did not address its compliance with DR 5–109 in its submissions or at the hearing. However, the firm does assert, and no one disputes, that it complied with Ethical Consideration 5–18 and Disciplinary Rule 4–101(B) of the Code. *See* (Memorandum of Law Submitted on Behalf of Cohen, Weiss & Simon In Response to the Election Officer's Application No. IX, *United States v. International Bhd. of Teamsters,* 88 Civ. 4486 at 5–7 (Apr. 16, 1997).) The only disputed ethical violation, therefore, is CW&S's compliance with DR 5–109. This Court takes seriously its duty to ensure the unwavering ethical conduct of the attorneys who appear before it, and therefore will consider whether, as Nash asserts, the CW&S attorneys breached DR 5–109, and, if so, the disciplinary action which should be taken against them.

Effective September 1, 1990, the Appellate Division of the New York Supreme Court adopted the Disciplinary Rules of the Code of Professional Responsibility under Title 22 of the New York Code, Rules and Regulations (the "Disciplinary Rules"). 22 N.Y.C.R.R. pt. 1200 (West 1997). These Disciplinary Rules are "applicable to all attorneys admitted to practice in New York State," 29 N.Y. Jud. Law app. (McKinney 1997 Supp.), are "mandatory in character," and set forth "the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." 29 N.Y. Jud. Law app. Preliminary Statement (McKinney 1992). DR 5–109, "Conflict of Interest—Organization as Client," provides:

> (a) When a lawyer employed or retained by an organization is dealing with the organization's directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, *the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.*

22 N.Y.C.R.R. § 1200.28 (1997) (adopting DR 5–109) (footnote omitted) (emphasis added). Davis is admitted to practice law in New York, (Tr. 14), and for purposes of the instant Opinion and Order this Court assumes that the other CW&S attorneys implicated in this matter are members of the New York bar. As a result, each of them is subject to the mandatory ethical conduct requirements of DR 5–109.

On its face, DR 5–109 simply requires an attorney who has an organization as a client to be cognizant of potential conflicts between the interests of the organization, and the organization's individual employees. *See* 22 N.Y.C.R.R. § 1200.28. When the attorney recognizes such a conflict, he must explain to the employee with whom he is dealing that the attorney represents the organization, not the employee. *See id.* The text of the rule, however, leaves unaddressed at least one consideration which is important to the case at bar. DR 5–109 does not inform attorneys specifically when they must explain to an employee that the attorney represents the employer, not the employee. The rule simply states "when" a lawyer becomes aware of such a conflict, he must make the required explanation to the employee. This Court

observes, however, that "when" could mean "immediately and without hesitation," it could mean "after thinking it over for a few days," or it could mean "anytime at all, just as long so it is done."

The timing issue aside, this Court finds that, in the instant case, CW&S did, in fact, comply with the minimal facial requirements of DR 5–109. On March 18, 1997, Davis informed Nash that he should obtain his own counsel and that CW&S represented the Carey Campaign rather than Nash personally. (Davis Decl. II 11.) This Court makes this finding reluctantly, however, and does so only because DR 5–109 does not clearly state when CW&S had to inform Nash that it did not represent him personally.

The following sequence of events demonstrates the reason for this Court's reluctance. Nash's communications with CW&S which he seeks to protect took place on March 10 and 12, 1997. (Davis Decl. I ¶¶ 5(c)-(d). On March 13, 1997, CW&S consulted its own outside counsel "concerning the status of [the firm's] conversations with Mr. Nash and other legal issues that the firm had encountered in connection with [the campaign contribution investigation])." *Id.* ¶ 5(e). On March 14, 1997, Davis informed Nash that CW&S would disclose the firm's communications with Nash to Carey, and Carey did not object. *Id.* ¶ 5(f). Not until March 18, 1997, did CW& inform Nash that he should engage personal counsel. *Id.* ¶ 5(g). It was only after Nash expressed his surprise that CW&S was not his counsel, that CW&S explained to Nash that the firm represented only the Carey Campaign, not Nash. (Davis Decl. II ¶ 11.) CW&S thus recognized its own interest in hiring outside counsel on March 13, 1997, but inexplicably delayed five days before it informed Nash that it did not represent him—and even then, did so only in response to Nash's question. Even more troubling, however, is that CW&S informed Nash that he should hire his own lawyer one day *after* Davis elicited Nash's waiver of privilege. Were it not for this Court's findings above that there are two independent reasons that Nash cannot assert an attorney-client privilege, this Court would refer the CW&S attorneys to the Committee on Grievances for this district. *See* (Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Local Civil Rule 1.5(a), (b) (1997).) Because this Court's finding that Nash cannot assert the privilege does not hinge solely upon his waiver, CW&S's conduct is not the sole proximate cause of Nash's inability to assert the privilege. Nevertheless, CW&S's conduct amply justifies this Court's reluctance in finding that CW&S complied with DR 5–109.

While CW&S's conduct may have complied with the letter of the Code of Professional Responsibility, it clearly trampled its spirit. The Code's Preamble reads in relevant part:

> Lawyers, as guardians of the law, play a vital role in the preservation of society.... A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

> Each lawyer must find within his own conscience the touchstone against which to test the extent to which his actions should rise above minimum standards. But in the last analysis it is the desire for the respect and confidence of the members of this profession and of the society which he serves that should provide to a lawyer the incentive for the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction.

29 N.Y. Jud. Law app. Preamble (McKinney 1992). This Court finds that CW&S's conduct in the instant matter did not rise at all above the minimum standards of conduct established by DR 5–109. While that may be sufficient to avoid sanction, it is far from the sound, ethical practice of law which courts, clients, and all others who come into contact with our legal system have a right to expect from attorneys who hold themselves out as "guardians of the law."

### CONCLUSION

IT IS HEREBY ORDERED THAT Application IX of the Election Officer for a declaratory judgment that Nash may not assert an attorney-client privilege over his communica-

tions with Cohen, Weiss & Simon is GRANTED.

SO ORDERED.