UNITED STATES of America,
Plaintiff–Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO; The Commission of La Cosa Nostra; Anthony Salerno, also known as Fat Tony; Matthew Ianniello, also known as Matty the Horse; Anthony Provenzano, also know as Tony Pro; Nunzio Provenzano, also known as Nunzi Pro; Anthony Corallo, also known as Tony Ducks; Salvatore Santoro, also known as Tom Mix; Christopher Furnari, Sr., also known as Christie Tick; Frank Manzo; Carmine Persico, also known as Junior, also known as The Snake; Gennaro Langella, also known as Gerry Lang; Philip Rastelli, also known as Rusty; Nicholas Marangello, also known as Nicky Glasses; Joseph Massino, also known as Joey Messina; Anthony Ficarotta, also known as Figgy; Eugene Boffa, Sr.;

Francis Sheeran; Milton Rockman, also known as Maishe; John Tronolone, also known as Peanuts; Joseph John Aiuppa, also known as Joey O'Brien, also known as Joe Doves, also known as Joey Aiuppa; John Phillip Cerone, also known as Jackie the Lackie, also known as Jackie Cerone; Joseph Lombardo, also known as Joey the Clown; Angelo Lapietra, also known as The Nutcracker; Frank Balistrieri, also known as Mr. B; Carl Angelo DeLuna, also known as Toughy; Carl Civella, also known as Corky; Anthony Thomas Civella, also known as Tony Ripe; General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, also known as Joe T, First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice President; Joseph W. Morgan, Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J. Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; Salvatore Provenzano, also known as Sammy Pro, Former Vice President, Defendants.

Jere Nash, Intervenor–Appellant.

Election Officer, Applicant–Appellee.

No. 2187, Docket 97–6092.

United States Court of Appeals,
Second Circuit.

Argued June 12, 1997.

Decided July 23, 1997.

Karen B. Konigsberg, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney for the Southern District of New York, of counsel), for Plaintiff–Appellee.

Christopher B. Mead, London & Mead, Washington, DC (Robert L. Vogel, of counsel), for Intervenor–Appellant.

Barbara Zack Quindel, Election Officer, Washington, DC (Theodore M. Lieverman, Tomar, Simonoff, Adourian, O'Brien, Kaplan, Jacoby & Graziano, Cherry Hill, NJ, of counsel), for Applicant–Appellee.

Before: WINTER, Chief Judge, ALTIMARI and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Appellant Jere B. Nash III ("Nash") was the campaign manager for Ron Carey's ("Carey") 1996 reelection bid for the office of president of the International Brotherhood of Teamsters ("IBT"). We consider here whether Nash may assert an attorney-client privilege over communications with counsel for the Campaign to Re–Elect Ron Carey ("Carey Campaign" or "Campaign") regarding Campaign matters. The Carey Campaign has waived any attorney-client privilege it possesses with respect to these

communications, wishing to disclose their content as part of its effort to cooperate with a currently pending investigation into alleged fundraising improprieties. Nash appeals from an order of the United States District Court for the Southern District of New York (David N. Edelstein, *Judge*) holding that Nash could not individually assert an attorney-client privilege with respect to the conversations at issue, and therefore could not prevent their disclosure by the Campaign. *United States v. International Bhd. Of Teamsters*, 961 F.Supp. 665 (S.D.N.Y.1997). We heard arguments on the appeal on June 12, 1997, and on that date entered a summary order affirming the order of the district court and indicating that an opinion would follow in due course. On July 1, 1997, we denied Nash's motion for a stay pending a petition for rehearing. This opinion explains our reasons for affirming the order of the district court.

## I.

The following facts drawn from the record are not disputed by the parties. This case arises from a 1989 consent decree entered into between the United States and the IBT, pursuant to which IBT elections are monitored by an Election Officer appointed by the United States District Court for the Southern District of New York (David N. Edelstein, *Judge*), which retains jurisdiction over enforcement of the decree. On February 4, 1997, following the reelection of Carey as president of the IBT, his opponent, James Hoffa, Jr. ("Hoffa"), lodged a formal protest with the Election Officer alleging that the Carey Campaign had engaged in certain impermissible fundraising activities. The Election Officer initiated an investigation.

IBT President Carey, on behalf of the Carey Campaign, authorized Cohen, Weiss & Simon ("CW & S"), counsel to the Campaign since June 1995, to cooperate fully with the investigation and to provide the Election Officer with all necessary information. During the course of the investigation, Susan Davis ("Davis"), a partner at CW & S, informed the Election Officer that she and other attorneys at her firm had spoken with appellant Nash, who had been hired as campaign manager for the Carey Campaign in February 1996, regarding issues relevant to the investigation. She also informed the Election Officer that Carey had decided to waive the Campaign's attorney-client privilege with respect to these conversations, and had instructed her to disclose their substance to the Election Officer. Nash thereupon sought to prevent such disclosures, arguing that he was entitled to assert a personal claim of attorney-client privilege with regard to these conversations.

Soon after becoming campaign manager in February 1996, and frequently thereafter, Nash spoke with attorneys from CW & S on a variety of Campaign matters. CW & S had served as counsel to the Campaign continuously since June 1995, and had never represented Nash or any other Campaign employee in an individual capacity. The events and conversations underlying the present dispute took place in March 1997. On March 6, a CW & S associate working under Davis, Nathaniel Charney ("Charney"), was on the line during a telephone conversation between Nash and a representative of the Election Officer's office regarding the investigation. When asked at the hearing before the district court why Charney had been on the line, Nash responded, "I've never thought about it. [Charney] said he wanted to be on the phone and I didn't object." Nash had also spoken with Charney in preparation for the telephone conversation to ensure that, in Nash's words, "we did what we needed to do as a campaign in responding to their requests for information."

On the following day, Nash received a telephone call from Davis requesting that he meet with attorneys from CW & S to discuss the Hoffa protest. The meeting took place at the offices of CW & S on March 10. Davis testified that she informed Nash at the meeting that CW & S had asked to speak with him as counsel for the Carey Campaign. She also testified that she told Nash that, because CW & S represented the Carey Campaign and Nash was the campaign manager, the conversation was "privileged." To explain her point about privilege to Nash, Davis contrasted Nash's situation with that of a person not employed by the Campaign with whom CW & S attorneys had met on

the previous day, a person whom they had warned that his statements were not privileged. Davis also testified that Nash was told that his comments to the CW & S attorneys would be reported to Carey, and that Nash was cautioned not to disclose the substance of the meeting to individuals outside of the Carey Campaign, since this could destroy the "privileged" nature of the conversation. The CW & S attorneys understood these references to "privilege" to mean the privilege belonging to the Carey Campaign, rather than to Nash individually, but there was never an explicit discussion between CW & S and Nash as to whose "privilege" was involved or whose prerogative it would be to waive it.

Davis asserts, and Nash does not dispute, that the substance of the March 10 meeting was limited to the allegations being made against the Campaign. Although Nash testified in the district court that he believed all along that his interests were identical to the Campaign's, and that CW & S represented him individually in addition to representing the Campaign, at no point during his conversations with CW & S did Nash seek, nor did CW & S provide, any personal legal advice. Neither, however, did the CW & S attorneys directly inform Nash prior to or during the March 10 meeting that they did not represent him personally, or that conflicts sometimes arise between the interests of an organization and the interests of one of its employees.

Two days after the New York meeting, on March 12, Nash received a telephone call from three CW & S lawyers and again answered questions pertaining to the Hoffa protest; once again, Nash did not seek or receive any personal legal advice. At the close of the conversation, Nash asked whether the conversation had been privileged. He was informed that it was, but again there was no suggestion as to whose privilege it might be. On March 13, attorneys from CW & S consulted with the firm's own outside counsel on a number of matters, including their concern that Nash might wish to assert a *personal* attorney-client privilege with regard to his comments to CW & S about the Hoffa protest. Davis testified that CW & S

had raised the question with outside counsel merely in a prudent effort to cover all possible issues affecting CW & S, and not because CW & S believed at the time that Nash could reasonably assert a personal attorney-client privilege.

On March 17, Nash called Davis and requested a meeting, but Davis indicated that she could not meet on that day because she was traveling to Washington to make a full report to Carey regarding the March 10 and 12 conversations with Nash. Nash raised no objections to the disclosure of this information to Carey. The next day Davis received a call from a representative of the Election Officer requesting an interview with Nash. Davis called Nash, informed him of the request, and recommended that Nash retain his own counsel for purposes of further inquiries by the Election Officer. Apparently surprised by the suggestion that he retain his own attorney, Nash stated his belief that CW & S was his personal counsel. In response, Davis explained that CW & S represented the Carey Campaign as an entity and had never represented Nash individually.

Davis subsequently notified the Election Officer of Carey's decision to waive the Campaign's attorney-client privilege, and to require CW & S and all Campaign personnel, including Nash, to cooperate with the investigation. The Election Officer was also informed, however, that Nash intended to assert a personal attorney-client privilege with respect to his conversations with CW & S. CW & S, in turn, decided not to disclose the substance of its conversations with Nash until a judicial ruling had been obtained on the privilege claim. Accordingly, the Election Officer filed an application ("Application IX") in the district court, pursuant to the Election Officer's authority under the consent decree, seeking a declaratory judgment that Nash possessed no attorney-client privilege with respect to his communications with CW & S. Nash intervened in the proceeding, opposing the Election Officer's application, and the United States appeared in support of the application.

The parties disagree as to the proper legal standard for deciding whether an employee may assert a personal attorney-client privi-

lege over disclosures to corporate[1] counsel on corporate matters. Nash maintains that it is the employee's "reasonable belief" of personal representation that governs, whereas the Election Officer and the United States argue for the applicability of a standard requiring, among other things, that the employee clearly indicate his interest in obtaining personal legal advice from corporate counsel. At a hearing conducted on April 17, 1997, at which both Davis and Nash testified, the district court granted the Election Officer's application in an oral ruling to the effect that Nash's conversations with CW & S enjoyed no personal attorney-client privilege and that, even if they had, Nash had waived the privilege by permitting CW & S to disclose the substance of the conversations to Carey. In a subsequent written Opinion and Order dated April 24, 1997, the court set forth its reasoning. While expressing doubt as to the wisdom of the "reasonable belief" standard urged by Nash, the district court found that there was no controlling precedent in this Circuit governing claims of privilege such as the one asserted by Nash, and declined to identify the proper standard. Instead, the court held that, even assuming *arguendo* that Nash's "reasonable belief" standard were appropriate, Nash's claim failed because his belief that CW & S represented him individually was unreasonable in the particular circumstances presented here. In any event, the court reasoned, Nash had waived any privilege to which he would arguably have been entitled by failing to object to the disclosure of his conversations to Carey.

## II.

■ This Court reviews rulings on claims of attorney-client privilege for abuse of discretion. *See United States v. Adlman,* 68 F.3d 1495, 1499 (2d Cir.1995). The issue of the standard that governs an employee's claim of attorney-client privilege with respect to communications to corporate counsel on corporate matters, however, is one of law, which we therefore review *de novo. Cf. In re Bevill, Bresler & Schulman Asset Mgmt.*

*Corp.,* 805 F.2d 120, 124 (3d Cir.1986) ("Although the applicability of a privilege is a factual question, determining the scope of a privilege is a question of law, subject to plenary review.").

### A.

■ The broad outlines of the attorney-client privilege are clear: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983,* 731 F.2d 1032, 1036 (2d Cir.1984) (internal quotation marks omitted). The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it. *See United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir.1989). The attorney-client privilege "serves the function of promoting full and frank communications between attorneys and their clients. It thereby encourages observance of the law and aids in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1990, 85 L.Ed.2d 372 (1985). However, since the attorney-client privilege "stands in derogation of the public's 'right to every man's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) (quoting 8 Wigmore, *Evidence* §§ 2192, 2291 at 70, 554 (1961)); *see also University of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571 (1990).

■ As the Supreme Court has observed, the applicability of the attorney-client privilege "presents special problems" when asserted by corporations or other entities, since entities must act through agents and cannot speak directly to their lawyers. *Weintraub,*

---

1. The terms "corporate" and "corporation" are used for ease of reference to refer to any entity that employs its own counsel to represent its interests, even though not all such entities are in fact corporations.

471 U.S. at 348, 105 S.Ct. at 1991. Recognizing that entities can act only through agents, courts have held that any privilege that attaches to communications on corporate matters between corporate employees and corporate counsel belongs to the corporation, not to the individual employee, and that employees generally may not prevent a corporation from waiving the attorney-client privilege arising from such communications. *See, e.g., United States v. Piccini,* 412 F.2d 591, 593 (2d Cir.1969) ("The instruction claimed to be privileged, however, was given by [the defendant] as an officer of the corporation, so that the privilege, if any, was that of the corporation, and may not be availed of by [the defendant]."), *cert. denied,* 397 U.S. 917, 90 S.Ct. 923, 25 L.Ed.2d 98 (1970); *In re Bevill,* 805 F.2d at 124 ("[A]ny privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer."); *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 611 n. 5 (8th Cir.1978) (en banc) ("Ordinarily, the privilege belongs to the corporation and an employee cannot himself claim the attorney-client privilege and prevent disclosure of communications between himself and the corporation's counsel if the corporation has waived the privilege."); *United States v. Weissman,* No. S1 94 CR. 760 CSH, 1996 WL 737042, at *13 (S.D.N.Y. Dec.26, 1996); *Polycast Tech. Corp. v. Uniroyal, Inc.,* 125 F.R.D. 47, 49 (S.D.N.Y.1989); *see also Weintraub,* 471 U.S. at 349, 105 S.Ct. at 1991 ("New managers ... may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."). There is no dispute in this case that Nash's communications with CW & S concerned only matters relevant to the Carey Campaign, and not to Nash as an individual.

Courts have been willing to allow corporate employees to assert a personal privilege with respect to conversations with corporate counsel, despite the fact that the privilege generally belongs to the corporation, but only by meeting certain requirements that Nash simply cannot satisfy. The Court of Appeals for the Third Circuit requires corporate employees to meet the following requirements:

> First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

*Bevill,* 805 F.2d at 123, 125 (quoting *In re Grand Jury Investigation No. 83–30557,* 575 F.Supp. 777, 780 (N.D.Ga.1983)) (alterations by *Bevill* court); *see also In re Standard Fin. Mgmt. Corp.,* 77 B.R. 324, 329 (Bankr. D.Mass.1987) (relying on *Grand Jury Investigation* for proposition that, "[i]n order to claim an individual as opposed to a corporate attorney/client privilege, when corporate officers approach corporate counsel for personal legal advice, it must be explicitly made clear to counsel that the advice is sought individually rather than in a corporate capacity.").

Other courts, though not relying on the formulation set out in *Grand Jury Investigation,* have nevertheless required an employee to make it clear to corporate counsel that he seeks legal advice on personal matters in order to assert a privilege over ensuing communications with corporate counsel. *See In re Grand Jury Proceedings, Detroit, Mich., August, 1977 (Jackier),* 434 F.Supp. 648, 650 (E.D.Mich.1977) ("If [a corporate officer] makes it clear when he is consulting the company lawyer that he personally is consulting the lawyer and the lawyer sees fit to accept and give communication knowing the possible conflicts that could arise, he may have a privilege."), *aff'd,* 570 F.2d 562 (6th Cir.1978); *see also United States v. Sawyer,* 878 F.Supp. 295, 296 (D.Mass.1995); *United States v. De Lillo,* 448 F.Supp. 840, 842–43 (E.D.N.Y.1978) (relying on *Jackier* standard). Again, it is not disputed in the instant

case that Nash neither sought nor received legal advice from CW & S on personal matters. He therefore may not prevent the Carey Campaign from disclosing his conversations with CW & S regarding corporate matters by asserting a personal claim of privilege.

## B.

Nash seeks to avoid this result by proposing an alternative standard for cases involving employee disclosures to corporate counsel on corporate matters. He argues that an employee should enjoy a personal privilege over such disclosures so long as the employee "reasonably believed" that he was being represented by corporate counsel on an individual basis. The cases drawn to our attention by appellant offer little support for this alternative standard, nor are we inclined to adopt it to govern cases of this sort.[2] The cases cited by Nash did rely on the individual's reasonable belief of personal representation to determine whether an attorney-client privilege attached, but they considered this belief only to resolve the issue of disqualification—namely, whether corporate counsel should be disqualified from representing an employee's former employer against the employee where counsel had allegedly established an attorney-client relationship with the employee. *See Cole v. Ruidoso Municipal Schools,* 43 F.3d 1373, 1384 (10th Cir.1994); *E.F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 387, 389 (S.D.Tex.1969). These disqualification cases never addressed the competing claims to privilege that are at issue here. They did not ask the question whether an employee's communications with corporate counsel solely regarding corporate matters may create a personal privilege that could effectively destroy the corporation's ability to waive its own privilege.[3] Cases that have addressed this more precise question, as noted above, have found no such personal privilege. Indeed, one of the cases relied upon by appellant, *E.F. Hutton,* while finding that an attorney-client relationship between an employee and corporate counsel was established for purposes of disqualification, refused to bar counsel from disseminating information obtained from the employee to the corporation where the information related solely to corporate matters and where the employee expected it to be disclosed to the corporation. 305 F.Supp. at 400–01.

Equally damaging to appellant's position is *Cole,* another case upon which appellant relies for his "reasonable belief" standard. In *Cole,* the Court of Appeals for the Tenth Circuit ultimately found that an employee's belief that corporate counsel represented her individually was unreasonable because "she consulted the law firm only for the purpose of carrying out her duties as principal.... It is the [employer] which, as the client, holds the right to have those communications protected and which may decide whether and to whom that information may be disclosed." 43 F.3d at 1384–85. Similarly here, the fact that Nash only consulted with CW & S in his official capacity and neither sought nor re-

---

**2.** Appellant's "reasonable belief" standard is not only not supported by the case law, but, as the district court observed, it is also unwise. This standard would provide employees seeking to frustrate internal investigations with an exceedingly powerful weapon, and would stray quite far from the principle that the attorney-client privilege should be "strictly confined," *In re Horowitz,* 482 F.2d at 81, in order to allow public access to "every man's evidence." *Id.; cf. Weintraub,* 471 U.S. at 353, 105 S.Ct. at 1993 (noting that permitting former corporate officers to prevent trustee in bankruptcy from waiving corporation's attorney-client privilege would frustrate Bankruptcy Code's goal of uncovering insider fraud).

**3.** An additional attorney disqualification case cited by appellant, *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311 (7th Cir.), *cert. denied,* 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978), is of no avail because it looked not only to the employee's reasonable belief that he was represented individually, but also to " 'his manifested intention to seek professional legal advice.' " *Id.* at 1319 (quoting McCormick, *Evidence* § 88, at 179 (2d ed.1972)). Nash manifested no intention to seek advice from CW & S in this case, but merely responded to its efforts to defend the Carey Campaign against the Hoffa protest. Also of no avail to appellant is a case decided by this Court which noted that the reasonable understanding of the client is crucial to determining whether an attorney-client relationship exists. *See United States v. Dennis,* 843 F.2d 652, 657 (2d Cir.1988). *Dennis* too did not consider competing claims of privilege between corporations and their employees, but merely addressed a general question of privilege for the purpose of determining whether counsel could cross-examine a witness on certain matters. *See id.* at 656–57.

ceived personal advice supports the district court's finding that Nash could not reasonably have believed that CW & S represented him individually. Since we decline appellant's invitation to adopt a "reasonable belief" standard, however, we do not reach the question of the reasonableness of Nash's belief that he was being individually represented. We also need not examine the district court's finding that Nash's consent to the disclosure to Carey constituted a waiver of any attorney-client privilege he might have possessed, *see International Bhd. Of Teamsters,* 961 F.Supp. at 673, inasmuch as we conclude that no privilege existed in the first place.

█ Like the district court, we are mindful that the attorneys from CW & S did not do all that they could have done to clarify the conflicts of interest that can and do develop between organizations and their employees, or to clarify that CW & S represented the Campaign alone. The district court found that the attorneys from CW & S violated the spirit, if not the letter, of the New York Code of Professional Responsibility, by failing to clarify that they did not represent Nash until five days after they had consulted their own outside counsel on the matter, and one day after they had received Nash's consent to disclose the conversations to Carey.[4] *See id.* at 675. That decision, of course, is not at issue here, nor do the arguably less-than-exemplary actions of CW & S lead us to change our interpretation of the law of attorney-client privilege. *Cf. In re Fidelity Guarantee Mort. Corp.,* 150 B.R. 864, 868 (Bankr. D.Mass.1993) (refusing to find personal privilege for corporate officers based on corporate counsel's failure to warn them that privilege belonged to corporation and could be waived by it). Nonetheless, we join the district court in reiterating that attorneys in all cases are required to clarify exactly whom they represent, and to highlight potential conflicts of interest to all concerned as early as possible.

---

4. Judge Edelstein ultimately found that CW & S satisfied the minimum requirements of the New York Code of Professional Responsibility, and decided not to impose sanctions. The particular rule with which Judge Edelstein was concerned was Disciplinary Rule 5–109, "Conflict of Interest—Organization as Client," which provides:

    (A) When a lawyer employed or retained by an organization is dealing with the organization's

## CONCLUSION

Because Nash neither sought nor received legal advice in his individual capacity during his conversations with CW & S, he may not assert a personal attorney-client privilege over the communications at issue here. In the circumstances presented, any attorney-client privilege arising from these conversations belongs to the Campaign alone, and may be waived at the Campaign's discretion. The Campaign having elected to waive the privilege, the Campaign's lawyers can respond to inquiries by the Election Officer regarding these communications. The order of the district court granting the Election Officer's application is therefore affirmed.

---

directors, officers, employees, members, shareholders or other constituents, and it appears that the organization's interests may differ from those of the constituents with whom the lawyer is dealing, the lawyer shall explain that the lawyer is the lawyer for the organization and not for any of the constituents.

N.Y. Jud Law App. (McKinney 1997) (footnote omitted).